# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Northern Mutual Insurance
Company,

                Plaintiff,

v.

The Cincinnati Insurance
Company,

                Defendant.

Case No. 20-cv-11781

Judith E. Levy
United States District Judge

Mag. Judge Patricia T. Morris

_____/

# OPINION AND ORDER DENYING
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23]

This is a declaratory judgment action involving a priority dispute between insurance companies under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101 *et seq.*[1] Plaintiff Northern Mutual Insurance Company has paid personal injury protection ("PIP") benefits to Jeremie Schultz, an individual who was seriously injured in a motor vehicle

---

[1] The case was removed to this Court on June 30, 2020. (ECF No. 1.) The removal notice states that the Court has original jurisdiction over this case because the amount in controversy exceeds $75,000 and the action is between citizens of different states (Plaintiff Northern Mutual Insurance Company is a citizen of Michigan, and Defendant The Cincinnati Insurance Company is a citizen of Ohio). (*See id.* at PageID.6–8; *see* ECF No. 1-1, PageID.15–16.)

accident, because Plaintiff is Schultz's personal automobile insurer. Plaintiff is suing Defendant The Cincinnati Insurance Company, the insurer of Devere Industrial, LLC ("Devere Industrial" or "Devere"), because Devere owned the vehicle Schultz was riding in at the time of the accident. Plaintiff's position is that Defendant is first in priority for PIP benefits under the employer-employee exception found in Mich. Comp. Laws § 500.3114(3) because Schultz was an employee of Devere. Defendant disagrees. It disputes that Schultz was an employee of Devere. Its position is that Plaintiff is first in priority for PIP benefits under Mich. Comp. Laws § 500.3114(1).

On September 1, 2021, Defendant filed a motion for summary judgment. (ECF No. 23.) The motion is fully briefed (ECF Nos. 29, 30), and the Court gave Defendant permission to submit supplemental filings. (ECF Nos. 32, 33, 35.) On January 20, 2022, the Court held a hearing by video conference and heard oral argument. For the reasons set forth below, Defendant's motion is DENIED.

## I.    Background

This case arises out of a motor vehicle accident that took place on highway M-117 on December 12, 2019. One of the vehicles involved in

the accident (1) was being driven by Schultz's coworker Derek Orban,[2] (2) was owned by Devere, and (3) was insured by Defendant. (*See* ECF No. 1-1, PageID.16.) Schultz was a passenger in the vehicle and was seriously injured. (*See id.*)

Orban and Schultz are union millwrights who live in Alpena, Michigan. (*See* ECF No. 23-3, PageID.102; ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.711; ECF No. 29-2, PageID.789.) In December 2019, they were working on a Devere project in Gwinn, Michigan, which is in the Upper Peninsula. (*See* ECF No. 1-1, PageID.16; ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.789.) Plaintiff states in the complaint that Orban and Schultz "were working for and under the direction of Devere Industrial, LLC through an employee staffing agreement with Commercial Contracting North, LLC" ("CCN"). (ECF No. 1-1, PageID.17.) Plaintiff states that CCN "hired and provided employees, including Derek Orban and Jeremie Schultz, to Devere." (*Id.*) According to Plaintiff, Devere "gave express consent for Derek

---

[2] The complaint states that "on December 12, 2019, Derek Orban lost control of the vehicle in a snowstorm while driving home from [a] project, crossed the centerline and struck another vehicle in a head-on collision." (ECF No. 1-1, PageID.16.) A copy of the accident report is attached to Defendant's summary judgment motion as Exhibit F. (*See* ECF No. 23-7.)

3

Orban to use the vehicle [involved in the accident] in the course and scope of their employment." (*Id.* at PageID.16.)

Plaintiff states that "as a result of the accident, Jeremie Schultz was significantly injured and has claimed and collected first-party personal protection benefits from [Plaintiff,] his own personal automobile insurer." (*Id.*; *see id.* at PageID.18.) Plaintiff brings this action because it believes that Defendant is obligated to cover Schultz's PIP benefits under the No-Fault Act.[3] (*See id.* at PageID.17–19.) Plaintiff states that Defendant is first in priority for PIP benefits under the employer-employee exception found in Mich. Comp. Laws § 500.3114(3) because Schultz was an employee of Devere "based upon the economic reality test" and a passenger in a vehicle owned by Devere. (*Id.* at PageID.17; *see id.* at PageID.17–19.)

---

[3] Plaintiff states that "under the terms and conditions of the automobile insurance policy [and under Mich. Comp. Laws § 500.3114(3)], the Defendant became obligated to reimburse Plaintiff for expenses or losses sustained by Jeremie Schultz arising out of the incident at issue" and "has become obligated to continue to reimburse certain expenses or losses to Jeremie Schultz relative to bodily injury sustained in the incident at issue." (ECF No. 1-1, PageID.18–19.) Plaintiff states that Defendant is obligated to pay for Schultz's healthcare expenses, loss of earnings, "[r]eplacement services," mileage, attendant care services, and other PIP benefits. (*Id.* at PageID.17.)

4

In the complaint, Plaintiff seeks declaratory and monetary relief that includes damages over $25,000, plus costs, interest, and "no-fault attorney fees." (*Id.* at PageID.19.) Defendant indicates in the notice of removal that "Plaintiff seeks damages for substantial medical bills" and that Defendant "has been advised that the amount in dispute is in excess of $75,000.00." (ECF No. 1, PageID.6.)

Defendant now seeks summary judgment. It argues that "[t]here is no legal basis for imposing upon [it] an obligation to pay PIP benefits" to Schultz because Schultz "was not an employee of [Defendant-]insured Devere." (ECF No. 23, PageID.76.) Defendant argues that Schultz was either an employee of CCN, "a separately owned and insured business" (*id.* at PageID.76–77), or an independent contractor. (*See id.* at PageID.84, 86.) Defendant also argues that it is not "liable for any potential PIP benefits" because "even if it were determined that Mr. Schultz were an employee of Devere, he was not acting within the scope of his employment at the time of the accident." (*Id.* at PageID.87–88.)

The "employee staffing agreement" between Devere and CCN that Plaintiff references in the complaint is discussed below. (ECF No. 1-1, PageID.17.) Also discussed below is the deposition testimony of

5

Christopher Crittenden (the owner of Devere), Brock Johnson (the owner of CCN), and Darwin Stienke (Schultz's supervisor in Gwinn).

## A. The Reciprocal Employee Staffing Master Agreement Between Devere and CCN

On May 23, 2017, a "Reciprocal Employee Staffing Master Agreement" was signed by the "Managing Member" of Devere— Christopher Crittenden—and the "Managing Member" of CCN—Brock Johnson. (ECF No. 23-6, PageID.198.) The Agreement states that its "Term . . . shall be one year from the date of execution. Upon expiration of the Term, the Agreement will automatically renew for one year unless canceled by either party in writing at least 30 days prior to the expiration of the Term." (*Id.*)

Other relevant portions of the Agreement are as follows:

1. **PARTIES AND SCOPE.** The Parties hereto wish to enter an agreement allowing one another to provide temporary staffing services to each other from time to time for a limited duration. The party whose employees will be provided to the other shall hereinafter be referred to as the "Employer." The Party to whom employees will be provided shall hereinafter be referred to as the "Staffed Party."

2. **EMPLOYER'S DUTIES AND RESPONSIBILITIES.** Employer will: a) provide, upon request by Staffed Party in the form of Exhibit A, its employees ("Assigned Employees") to perform certain construction labor, project management,

6

and/or plant maintenance work under Staffed Party's supervision; b) pay Assigned Employees' wages and provide them with the benefits that Employer offers to them; c) pay, withhold, and transmit payroll taxes; provide unemployment insurance and workers' compensation benefits; and handle unemployment and workers' compensation claims involving Assigned Employees; and d) [r]equire Assigned Employees to sign agreements (in the form of Exhibit B) acknowledging that they are not entitled to holidays, vacations, disability benefits, insurance, pensions, or retirement plans, or any other benefits offered or provided by Staffed Party.

3. **STAFFED PARTY DUTIES AND RESPONSIBILITIES.** Staffed Party will: a) properly supervise Assigned Employees performing its work and be responsible for its business operations, products, services, and intellectual property; b) properly supervise, control, and safeguard its premises, processes, or systems, and not entrust Assigned Employees with unattended premises, cash, checks, keys, credit cards, merchandise, confidential or trade secret information, negotiable instruments, or other valuables; c) provide Assigned Employees with a safe work site and provide appropriate information, training, and safety equipment with respect to any hazardous substances or conditions to which they may be exposed at the work site; and d) not change Assigned Employees' job duties without express prior written approval from Employer.

4. **PAYMENT TERMS.** Staffed Party will pay Employer for its performance at the rates set forth on Exhibit A and will also pay any additional costs or fees set forth in this Agreement. Employer will invoice Staffed Party for services provided under this Agreement on a monthly basis. Payment is due on receipt of invoice. Invoices will be supported by the pertinent

7

time sheets or other agreed system for documenting time worked by the Assigned Employees. Staffed Party's authorized signature or other agreed method of approval of the work time submitted for Assigned Employees certifies that the documented hours are correct and authorizes Employer to bill Staffed Party for those hours. If a portion of any invoice is disputed, Staffed Party will pay the undisputed portion.

Assigned Employees, when so directed by Staffed Party and in furtherance of the work of the Assigned Employees, are hereby authorized to purchase construction materials on behalf of Employer for the use by and benefit of Staffed Party. Employer shall invoice Staffed Party for any purchased materials as set forth on Exhibit A.

Assigned Employees are presumed to be nonexempt from laws requiring premium pay for overtime, holiday work, or weekend work. Employer will charge Staffed Party special rates for premium work time only when an Assigned Employee's work on assignment to Staffed Party, viewed by itself, would legally require premium pay and Staffed Party has authorized, directed, or allowed the Assigned Employee to work such premium work time. Staffed Party's special billing rate for premium hours will be the same multiple of the regular billing rate as Employer is required to apply to the Assigned Employee's regular pay rate. (For example, when federal law requires 150% of pay for work exceeding 40 hours in a week, Staffed Party will be billed at 150% of the regular bill rate.)

In addition to the bill rates specified in Exhibit A of this Agreement, Staffed Party will pay Employer the amount of all new or increased labor costs associated with Staffed

Party's Assigned Employees that Employer is legally required to pay—such as wages, benefits, payroll taxes, social program contributions, or charges linked to benefit levels—until the parties agree on new bill rates.

\* \* \*

7. **MISCELLANEOUS.** No provision of this Agreement may be amended or waived unless agreed to in a writing signed by the parties. Each provision of this Agreement will be considered severable, such that if any one provision or clause conflicts with existing or future applicable law or may not be given full effect because of such law, no other provision that can operate without the conflicting provision or clause will be affected. This Agreement and the exhibits attached to it contain the entire understanding between the parties and supersede all prior agreements and understandings relating to the subject matter of the Agreement.

\* \* \*

This Agreement shall be construed in accordance with the laws of the State of Michigan.

(*Id.* at PageID.196–198.)

Exhibit A to the Agreement is titled "Employee/Labor Request and Rate Form." (*Id.* at PageID.199.) This document contains a table with five columns that are labeled as follows: (1) "Job name/location," (2) "Type of requested labor," (3) "Number of Assigned Employees," (4) "Hourly rate to be paid to Assigned Employees," and (5) "Rate to be

billed to Staffed Party." (*Id.*) The nine cells in each column are blank. (*See id.*) At the bottom of the form, there are blank lines for identifying who from the Employer is making the proposal and on what date, and who from the Staffed Party is accepting the proposal and on what date. (*See id.*)

Exhibit B to the Agreement is titled "Waiver for Assigned Employees." (*Id.* at PageID.200.) This document states:

> In consideration of my assignment to STAFFED PARTY by EMPLOYER, I agree that I am solely an employee of EMPLOYER for benefits plan purposes and that I am eligible only for such benefits as EMPLOYER may offer to me as its employee. I further understand and agree that I am not eligible for or entitled to participate in or make any claim upon any benefit plan, policy or practice offered by STAFFED PARTY, its parents, affiliates, subsidiaries, or successors to any of their direct employees, regardless of the length of my assignment to STAFFED PARTY by EMPLOYER and regardless of whether I am held to be a common-law employee of STAFFED PARTY for any purpose; and therefore, with full knowledge and understanding, I hereby expressly waive any claim or right that I may have, now or in the future, to such benefits and agree not to make any claim for such benefits.

(*Id.*) Beneath this language are blank signature lines for "Assigned Employee" and "Witness." (*Id.*)

10

## B.   The Deposition Testimony of Christopher Crittenden, the Owner of Devere

Crittenden has owned Devere since October 2014 (*see* ECF No. 23-4, PageID.127; ECF No. 29-1, PageID.706), but Devere "didn't start any contract work until 2016." (ECF No. 23-4, PageID.141; ECF No. 29-1, PageID.761.) Devere "provide[s] . . . skilled millwright[4] labor to local plants, cement plants, limestone plants, wood plants for their equipment overhauls. I[t] . . . provide[s] general laborers to a cement plant in Alpena to provide a daily cleanup test." (ECF No. 23-4, PageID.128; ECF No. 29-1, PageID.707.) The number of Devere's employees "fluctuates," but it had "between 50 and 60" employees at the time of Crittenden's deposition. (ECF No. 23-4, PageID.128; ECF No. 29-1, PageID.708.) Crittenden indicated that Devere does not have union employees. (*See* ECF No. 23-4, PageID.128; ECF No. 29-1, PageID.709.)

Regarding the relationship between Devere and CCN, Crittenden testified: "I have a staffing agreement with Commercial Contracting

---

[4] When asked during his deposition what millwrights do, Crittenden explained that "when the cement plant shuts down in the winter, they hire us to overhaul their equipment, such as their kilns, coolers, bag houses, bucket elevators, drag lines. We rebuild all the worn, damaged parts." (ECF No. 23-4, PageID.128; ECF No. 29-1, PageID.708.)

11

North to provide me with union millwrights on an as-needed basis."
(ECF No. 23-4, PageID.128; ECF No. 29-1, PageID.708–709.) When
asked during his deposition if he has "any affiliations with CCN"
besides the Agreement, Crittenden responded: "I do not, no." (ECF No.
23-4, PageID.142; ECF No. 29-1, PageID.766.) Crittenden does not have
any ownership or financial interest in CCN. (*See id.*)

CCN does, in fact, "provide union millwrights [to Devere] on an as-
needed, on-call basis." (ECF No. 23-4, PageID.128; ECF No. 29-1,
PageID.709.) At the time of his deposition, Crittenden had four CCN
employees working for him, but the number "varies." (ECF No. 23-4,
PageID.140; ECF No. 29-1, PageID.755–756.) On Devere job sites, CCN
employees are treated no differently than Devere employees. (*See* ECF
No. 23-4, PageID.142; ECF No. 29-1, PageID.765.)

Devere uses union employees because "they have four years of
training through the union hall, so they typically have a higher skill set
than the non-union employees." (ECF No. 23-4, PageID.136; ECF No.
29-1, PageID.739.) Crittenden does not hire or employ his own union
millwrights because "I'm not allowed to employ union millwrights. They
have to work for a contractor that has agreements with the union

itself." (ECF No. 23-4, PageID.143; ECF No. 29-1, PageID.769.) During his deposition, Crittenden agreed with Plaintiff's counsel's statement that "this is not just a unique situation with [Crittenden or Devere], but would be similar to other businesses that would want to use union employees, there would be two separate entities working together on these projects." (ECF No. 23-4, PageID.143; ECF No. 29-1, PageID.770.)

Crittenden agreed that CCN's "line of work is to provide skilled labor millwrights to companies like DeVere," and he "do[es] not know what . . . [CCN] do[es] outside of staffing [his] employees." (ECF No. 23-4, PageID.128, 136–137; ECF No. 29-1, PageID.709–710, 742–743; *see* ECF No. 23-4, PageID.142–143; ECF No. 29-1, PageID.765–767, 770.) Crittenden stated that CCN "do[es] not try to compete with DeVere" in bidding for projects. (ECF No. 23-4, PageID.128, 136; ECF No. 29-1, PageID.709–710, 742.)

With respect to the "financial arrangement between DeVere and CCN," Crittenden testified that "CCN would bill me on a weekly basis for hours worked. We had a net 30 pay arrangement." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.727–728.) Crittenden "would provide a lump-sum payment to CCN directly based upon an itemized

13

sheet they would give [him] for the [hours of] work that they had performed." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.728; *see* ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.753.) The payment's total amount was based on the number of hours worked by CCN employees on the job. (*See* ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.753.) Devere does not pay taxes for CCN or CCN's employees. (*See* ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.729.)

Crittenden stated that CCN rents office space from him, but "CCN has a separate office door." (ECF No. 23-4, PageID.136; ECF No. 29-1, PageID.741.) Devere's business address is "1001 West Washington Avenue," and CCN's business address is "1005 West Washington Avenue." (*Id.*) Crittenden agreed that there is "no commingling/interaction at the offices between CCN and [his] employees." (*Id.*)

Crittenden testified that Orban and Schultz "were union millwrights that were employed by CCN." (ECF No. 23-4, PageID.128; ECF No. 29-1, PageID.710.) Orban and Schultz have never been employees of Devere. (*See* ECF No. 23-4, PageID.134, 136, 138, 140; ECF No. 29-1, PageID.732, 739–740, 750, 756.) At the time of the

14

accident, they were working at the National Carbon plant in Gwinn "performing millwright work," possibly "installing equipment." (ECF No. 23-4, PageID.128–129; ECF No. 29-1, PageID.710–711; *see* ECF No. 23-4, PageID.142; ECF No. 29-1, PageID.765.) Orban was in Gwinn "a total of seventeen weeks," and Schultz was there "on and off for that time. He wasn't there the full time." (ECF No. 23-4, PageID.140; ECF No. 29-1, PageID.757.)

Devere started working at the National Carbon plant in Gwinn in 2018 providing "skilled contractor services." (ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.716; *see* ECF No. 23-4, PageID.142; ECF No. 29-1, PageID.765.) Crittenden agreed during his deposition that "from the outset of that contract, it was understood that CCN would have their employees on site." (ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.716.) Both Devere and CCN established the policies and protocols for workers to follow at the Gwinn plant. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) Crittenden testified that Johnson "ha[d] no involvement with that facility" apart from signing the Agreement. (ECF No. 23-4, PageID.131; ECF No. 29-1, PageID.721.)

15

In Gwinn, Orban and Schultz typically worked forty hours per week: eleven hours on Monday through Wednesday and seven hours on Thursday. (*See* ECF No. 23-4, PageID.129, 133; ECF No. 29-1, PageID.711, 730.) Orban, Schultz, and all Devere and CCN employees working in Gwinn had the option to stay at an apartment in the Gwinn area every day, including weekends. (*See* ECF No. 23-4, PageID.129, 139, 142; ECF No. 29-1, PageID.711–712, 751, 764.) Devere rented and paid for the apartment (*see* ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.751) and was reimbursed for it by the National Carbon plant. (*See* ECF No. 23-4, PageID.142; ECF No. 29-1, PageID.764–765.)

When Orban and Schultz chose to go back and forth between Gwinn and Alpena, they were expected to use their own personal vehicles. (*See* ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.712.) In Gwinn, they did not have a Devere vehicle assigned to them or available to use while working at the plant. (*See id.*) There was "one DeVere vehicle that only the superintendent on site would have." (ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.712–713; *see* ECF No. 23-4, PageID.136–137; ECF No. 29-1, PageID.742, 744–745.)

16

Crittenden stated that Darwin Stienke was the site supervisor or site superintendent at the Gwinn plant since the beginning of Devere's contract with that facility. (*See* ECF No. 23-4, PageID.129–130; ECF No. 29-1, PageID.712, 715–716.) Stienke has been employed by CCN since 2016, and his title is "supervisor." (ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.713.) Stienke never worked for Devere. (*See* ECF No. 23-4, PageID.140; ECF No. 29-1, PageID.757.)

Stienke supervised the workers at the Gwinn plant—"both CCN and DeVere employees"—so they all reported to him. (ECF No. 23-4, PageID.129–130; ECF No. 29-1, PageID.713–714, 717.) In December 2019, Crittenden had "six DeVere employees working on site" who were "assisting the plant with the production process, and a couple of the guys were doing some millwright work." (ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.714.) The week of the accident, three CCN employees—"two CCN employees plus [Stienke]"—were working in Gwinn. (ECF No. 23-4, PageID.138; ECF No. 29-1, PageID.749.) Crittenden needed the CCN employees "[f]or their technical millwright expertise"; CCN's union millwrights were "more skilled" than Devere's

17

non-union millwrights, as noted above. (ECF No. 23-4, PageID.138; ECF No. 29-1, PageID.750.)

The Gwinn plant is the only Devere job in which a CCN supervisor oversees both Devere and CCN employees. (*See* ECF No. 23-4, PageID.142; ECF No. 29-1, PageID.766.) At all other Devere jobs, CCN employees are supervised by a Devere supervisor.[5] (*See* ECF No. 23-4, PageID.137–138; ECF No. 29-1, PageID.746, 748.) The Gwinn plant did not have a Devere supervisor because Stienke had worked at that plant "on and off for the past eight or nine years" and "helped build the plant when it was built a number of years ago," so he was "most familiar with it." (ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.713–714.)

Crittenden indicated that no one from Devere had "any day-to-day supervision or any kind of involvement with CCN employees on a day-to-day basis while they're up in Gwinn." (ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.714.) No agreements were signed between Devere and the CCN employees stationed in Gwinn. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) When a certain task was

---

[5] But Crittenden also testified that at a different plant, Orban was a foreman who oversaw both Devere and CCN employees. (*See* ECF No. 23-4, PageID.142; ECF No. 29-1, PageID.766.)

completed, Stienke reported that to Crittenden by calling him on the phone "to inform [him] that the job was done." (ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.718.)

Devere provided workers in Gwinn with power tools, welders, and personal protective equipment ("PPE") or safety items (*see* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.715) "such as safety glasses or dust masks or safety vests." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.727.) The equipment and supplies needed for the Gwinn project were purchased or owned by Devere. (*See* ECF No. 23-4, PageID.137; ECF No. 29-1, PageID.746.) Stienke oversaw the workers' use of these items and made sure they were used properly. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.715; *see also* ECF No. 23-4, PageID.133 (stating that Stienke, "as the superintendent," was the person who made sure the PPE was used); ECF No. 29-1, PageID.727 (same).) The workers in Gwinn supplied their own millwright tools for the job, so "[t]hey would bring their own hand tools, such as wrenches, sockets, hammers." (ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.715–716.) Workers "could [also] provide and wear their own

[PPE or safety items] if they so choose." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.727.)

According to Crittenden, CCN employees working in Gwinn were disciplined by CCN. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.716.) Their paycheck came from CCN. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) If they wanted to take time off, they requested it from Stienke. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.716–717.) Crittenden was unaware of how CCN employees are compensated because "[t]hey're employed by CCN." (ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.718.) He stated that Devere did not provide benefits—such as workers' compensation, health insurance, or bonuses—to CCN employees working in Gwinn. (*See id.*)

With respect to the Reciprocal Employee Staffing Master Agreement, Crittenden indicated that he entered into the Agreement with Johnson in May 2017 and that the Agreement has been in effect since that time. (*See* ECF No. 23-4, PageID.131; ECF No. 29-1, PageID.720–721.) Crittenden stated that the purpose of the Agreement was "[t]o protect each company" from "[a]ny negligence that may be caused by the other employees' staff—their company's staff. . . . It's just

a way of protecting each company from any wrongdoing that each company is subject to." (ECF No. 23-4, PageID.131; ECF No. 29-1, PageID.719–720.) When asked "how the document operates in real life," Crittenden responded: "It's a staffing agreement between the companies that allows . . . DeVere to receive union millwrights from CCN." (ECF No. 23-4, PageID.131; ECF No. 29-1, PageID.720.) Crittenden indicated that there is no other agreement between the two entities "that governs the staffing agreement in place." (*Id.*) Crittenden also indicated that he and Johnson did not sign a renewal of the Agreement or an agreement other than the one signed in 2017. (*See* ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.752.)

Crittenden agreed during his deposition that under the Agreement, CCN was the "Employer" and Devere was the "Staffed Party" in Gwinn. (ECF No. 23-4, PageID.131, 139, 141–142; ECF No. 29-1, PageID.722, 751, 762–763.) This was always the relationship between them. (*See* ECF No. 23-4, PageID.131–132; ECF No. 29-1, PageID.722–723.) Crittenden indicated that the Agreement applies to Orban and Schultz and that Devere and CCN's arrangement in Gwinn was consistent with the language of paragraph 2(a) of the Agreement,

which states that the Employer will "provide, upon request by Staffed Party in the form of Exhibit A, its employees ('Assigned Employees') to perform certain construction labor, project management, and/or plant maintenance work under Staffed Party's supervision." (ECF No. 23-4, PageID.132; ECF No. 23-6, PageID.196; ECF No. 29-1, PageID.723.) Crittenden agreed that CCN was responsible for the duties identified in paragraph 2(b), (c), and (d) of the Agreement. (*See* ECF No. 23-4, PageID.132; ECF No. 29-1, PageID.723–724.) These duties include paying Assigned Employees' wages and providing them with benefits; taking care of Assigned Employees' payroll taxes, providing them with unemployment insurance and worker's compensation benefits, and handling their unemployment and workers' compensation claims; and requiring Assigned Employees to sign the Agreement's Exhibit B. (*See* ECF No. 23-6, PageID.196.)

Crittenden does not know if Orban or Schultz signed Exhibit B to the Agreement. (*See* ECF No. 23-4, PageID.132; ECF No. 29-1, PageID.724.) Crittenden stated that "CCN employees did not sign anything on my behalf to work for DeVere. . . . Any agreements [Orban and Schultz] would have signed would have been with CCN." (ECF No.

22

23-4, PageID.132; ECF No. 29-1, PageID.725.) As a result, Crittenden is "not privy to what contract documents [Orban and Schultz] signed, if any." (*Id.*)

Crittenden agreed that paragraph 3 of the Agreement outlines Devere's "duties and responsibilities," so it is responsible for carrying out what appears in paragraph 3(a), (b), (c), and (d). (ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.712, 751–752.) When asked about paragraph 3(a) and (b), Crittenden agreed that he put Stienke in charge of "properly supervising [A]ssigned [E]mployees," that Stienke had control over the Assigned Employees, and that "DeVere maintained responsibility for . . . the work on the contract that it had done with the plant up in Gwinn." (ECF No. 23-4, PageID.132; ECF No. 29-1, PageID.725–726.) Crittenden stated that "[a]t th[e] [Gwinn] plant, I was paying CCN to provide [Stienke] as the supervisor." (ECF No. 23-4, PageID.142; ECF No. 29-1, PageID.763.) When asked about paragraph 3(c), Crittenden indicated that there were no "hazardous substances or conditions to which [Assigned Employees] might be exposed at the [Gwinn] work site," so Devere "did not provide anything in that aspect for this job." (ECF No. 23-4, PageID.132–133; ECF No. 29-1,

PageID.726–727.) Crittenden testified that CCN provided "a safe worksite and . . . appropriate information, training, and safety equipment." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.727.)

Regarding the Agreement's Exhibit A, Crittenden did not recall during his deposition what rates are paid, but he indicated that "we do have a . . . set rate. We do have different rates that we have to pay CCN between the Lower Peninsula and Upper Peninsula." (ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.753.) Crittenden agreed that in his "day-to-day operations," he is "not filling out Exhibit A every time [he] use[s] [CCN's] employees." (ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.754.) Instead, Crittenden makes a request to Johnson by phone or in person for the number and type of employees he needs for a job, and Johnson tells Crittenden whether or not that might be possible. (*See id.*)

Crittenden stated during his deposition that he was not familiar with Exhibit B to the Agreement and "would not say it's used on a daily basis." (ECF No. 23-4, PageID.139–140; ECF No. 29-1, PageID.754–755.) Crittenden does not make sure that CCN employees sign this

24

document every time a new group of them comes to one of his jobs. (*See* ECF No. 23-4, PageID.140; ECF No. 29-1, PageID.755.)

As to Orban's use of the Devere vehicle involved in the accident, Crittenden testified that Orban asked Crittenden if he could borrow the vehicle because Orban thought it would be safer to drive the vehicle in the snow than his own two-wheel-drive truck. (*See* ECF No. 23-4, PageID.133, 137, 140, 144; ECF No. 29-1, PageID.729–730, 745, 758, 771.) Crittenden "told him he could." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.730.) In Crittenden's view, he allowed Orban to borrow the vehicle as a personal favor. (*See* ECF No. 23-4, PageID.143; ECF No. 29-1, PageID.767.) Crittenden indicated that driving the vehicle was not part of Orban's responsibilities; Orban "had driven his [own] truck the previous 16 weeks, back and forth." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.730.) Crittenden agreed that Orban "was requesting . . . [to] use [the Devere vehicle], because he wanted to use it for personal use." (*Id.*)

Crittenden does not know why Orban and Schultz chose to drive on the particular Thursday on which the accident took place or why they chose to leave when they did. (*See* ECF No. 23-4, PageID.134; ECF

25

No. 29-1, PageID.731.) In addition, Crittenden did not know that Schultz would be riding in the vehicle with Orban. (*See* ECF No. 23-4, PageID.134; ECF No. 29-1, PageID.732.) Crittenden's understanding is that when their workday ends on a Thursday, they are "off the clock, no longer working." (ECF No. 23-4, PageID.134; ECF No. 29-1, PageID.731.) The Agreement does not impose weekend job responsibilities on Orban and Schultz. (*See id.*)

## C. The Deposition Testimony of Brock Johnson, the Owner of CCN

Johnson started CCN in 2016 and is its sole owner.[6] (*See* ECF No. 23-3, PageID.101; ECF No. 29-2, PageID.785.) CCN is a "general contracting and labor" business. (ECF No. 23-3, PageID.101; ECF No. 29-2, PageID.786.) The number of its employees depends on need and availability; Johnson indicated that CCN "is a union company, so it depends upon what the project consists of and who we need and who we can get from where." (*Id.*) Johnson stated that "being that [his employees] [a]re union, they can, unfortunately, jump ship anywhere"

---

[6] When Johnson started CCN, he knew that Crittenden was opening Devere. (*See* ECF No. 23-3, PageID.105; ECF No. 29-2, PageID.803.) Johnson agreed during his deposition that part of his business plan, or part of why he opened CCN, "was the fact that there was an outlet or a place for [him] to provide union millwrights." (*Id.*)

and on any given day. (ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.805–806.)

When asked to explain his relationship with his employees and if he has a list of union millwrights whom he calls, Johnson responded: "Yeah, I call the business agency. I've got my employee list. We're always actively seeking new people to bring into the apprentice program." (ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.806.) In terms of Johnson's relationship with Schultz, the following exchange took place during Johnson's deposition:

> Q. So if you were to call [Schultz] and offer—I would assume that you call him and say, hey, I have work. Is that how it works?
>
> A. Yes.
>
> Q. And you would say I need you to go to, in this case, Gwinn, Michigan, to work on X job?
>
> A. Correct.

(ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.806–807.) Johnson testified that Schultz also worked on non-Devere jobs as an employee of CCN because he worked for other union companies. (*See* ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.806.)

27

Johnson indicated that his employees do not show up for work at CCN's office or shop every day. (*See* ECF No. 23-3, PageID.106, 109; ECF No. 29-2, PageID.805, 818.) Instead, they go directly to the job site. (*See* ECF No. 23-3, PageID.109; ECF No. 29-2, PageID.818.) He indicated that Devere employees do not show up at Devere's shop on a daily basis either. (*See* ECF No. 23-3, PageID.109; ECF No. 29-2, PageID.818–819.)

Johnson and Crittenden have worked together since they started operating their companies in 2016. (*See* ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.813.) Johnson stated that Devere does "[g]eneral contracting and mostly industrial" and is not a "union shop." (ECF No. 23-3, PageID.101; ECF No. 29-2, PageID.787.) CCN does business with other companies (*see id.*), but it mostly provides union millwrights to Devere.[7] (*See* ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.805.) In

---

[7] During Johnson's deposition, the following exchange took place regarding CCN providing union millwrights to other companies and to Devere:

Q. When you provide union millwrights to other companies—do you provide them to any other company other than DeVere?

A. No.

Q. So if your union millwrights are working for anyone other than you at CCN, it would be for DeVere Industrial, fair?

addition to supplying labor to other businesses, CCN bids for its own projects and does construction work. (*See* ECF No. 23-3, PageID.101, 105–106; ECF No. 29-2, PageID.787, 803–805.) In 2019, approximately sixty percent of CCN's business was providing millwrights, and forty percent was general contracting for residential and commercial construction. (*See* ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.804.)

Johnson testified that Orban and Schultz were employees of CCN when the December 2019 accident took place. (*See* ECF No. 23-3, PageID.102, 110; ECF No. 29-2, PageID.788, 791, 820.) Their workweek at the Devere project in Gwinn consisted of four ten-hour days, Monday through Thursday. (*See* ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.789.) At the end of the workweek, they went home. (*See id.*) But they had the option to stay at an apartment that was close to the project. (*See* ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.789–790.) The apartment was provided rent-free by Devere. (*See* ECF No.

---

A. Mostly, correct. I do provide some millwrights for friends or other companies that, you know, they need something fixed that I can provide an operator for, and I will do that.

(ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.805.)

23-3, PageID.110; ECF No. 29-2, PageID.820.) Johnson indicated that he expected Orban and Schultz to use their personal vehicles when traveling between the Upper Peninsula and their homes. (*See* ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.790.)

Johnson was Orban's and Schultz's boss and was in charge of disciplining them, guiding them, and making sure they were getting their wages. (*See* ECF No. 23-3, PageID.102–103; ECF No. 29-2, PageID.790–791.) When asked during his deposition if anyone other than Johnson or Stienke had supervisor responsibility over Orban or Schultz, Johnson responded: "The owner of DeVere, who they were working for, any of the DeVere supervisors could direct us." (ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.790.) But Johnson was never Schultz's boss "at Devere Industrial, with [Schultz] being employed by Devere Industrial." (ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.807.)

Orban's and Schultz's supervisor in Gwinn was Stienke, an employee of CCN. (*See* ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.790.) Stienke was the "project manager" or "supervisor" on the Gwinn job. (ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.810.)

30

Stienke supervised both CCN and Devere employees. (*See* ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.812.) CCN employees in Gwinn were treated no differently than Devere employees. (*See* ECF No. 23-3, PageID.110; ECF No. 29-2, PageID.820–821.) If a CCN employee Stienke supervised needed to be reprimanded and/or fired from a job, Stienke would approach Johnson, and Johnson would take care of reprimanding and/or firing that employee. (*See* ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.812–813.)

Johnson indicated that Crittenden requested Stienke for the supervisor position at the Gwinn job. (*See* ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.810.) According to Johnson, Stienke was at the Gwinn job for a couple of years, has "the most knowledge of that particular plant," and has "the most familiarity with that client." (ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.810–811.)

At the Gwinn job, Stienke reported to Crittenden (*see id.*), and the two of them talked daily. (*See* ECF No. 23-3, PageID.110; ECF No. 29-2, PageID.823.) Johnson agreed during his deposition that when Stienke was in Gwinn, Stienke contacted Crittenden "if he needed material or supplies," if he had "[i]ssues with tools, welders, things that DeVere

31

provided," or "if there was questions on how to do the job and what needed to be done and he needed that direction." (ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.811.) Johnson was asked: "So for all intents and purposes while there, [Stienke] was working for [Crittenden], fair?" (ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.812.) Johnson responded: "Yes." (*Id.*) Johnson testified that on the Gwinn job, Stienke "would take direction from our client," and the "client" was Devere. (*Id.*) Johnson would not find it "odd" if Crittenden reached out to Stienke about a future job opportunity, but any agreement regarding the job would be between CCN and Devere. (ECF No. 23-3, PageID.110; ECF No. 29-2, PageID.823.)

When they went to the job in Gwinn, Orban and Schultz brought some of their own millwright tools with them to do their work. (*See* ECF No. 23-3, PageID.104; ECF No. 29-2, PageID.798.) They were not required to wear a uniform or something resembling a uniform. (*See id.*) CCN does not provide union millwrights such as Orban and Schultz

32

with tools, a vehicle, or larger equipment (like welders).[8] (*See* ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.808.)

CCN paid Orban's and Schultz's wages when they worked in Gwinn. (*See id.*) The union millwrights' wages "are dictated by the union." (*Id.*) For the Devere project in Gwinn, Johnson calculated the hours worked by each of his employees every week and then billed Devere for the hours worked, plus a percentage. (*See* ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.808–809.) The percentage is how CCN makes money on the contract. (*See* ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.809.) Devere pays CCN on a monthly basis, and CCN pays its employees weekly "[o]r whatever the agreement is with that particular union." (*Id.*) During his deposition, Johnson agreed that CCN's role on the Gwinn job was similar to that of a "temp agency" by "contracting employees and simply providing them and paying them a wage." (ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.809–810.) In terms of benefits, Johnson indicated that "[t]he union provides the

---

[8] CCN owns equipment, but that equipment is "provided and/or used when [it is the] high bidder on the job and being the general on that job." (ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.808.)

benefits." (ECF No. 23-3, PageID.102–103; ECF No. 29-2, PageID.791, 793–794.)

Regarding the Reciprocal Employee Staffing Master Agreement, Johnson testified that "[i]t's an agreement between DeVere and CCN for us to provide the labor upon needed." (ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.788.) He identified the Agreement's purpose as "indicating that if they call upon us and we have the available resources, we'll provide people to them . . . for a cost, whatever the local union scale is, plus a percentage." (*Id.*)

Johnson agreed during his deposition that when he and Crittenden started their companies, they had intended that the Agreement would be signed before every job; that, however, has not in fact happened. (*See* ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.813–814.) The Agreement was not signed for the job in Gwinn. (*See* ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.814.) Johnson also indicated that Exhibit B is not used. (*See id.*) At the same time, Johnson testified that in his mind, the Agreement was supposed to be a "master agreement." (ECF No. 23-3, PageID.110; ECF No. 29-2,

34

PageID.823.) The following exchange regarding this characterization of the Agreement took place during Johnson's deposition:

> Q. . . . So at the time that you and CCN and DeVere Industrial entered into that agreement, the intention was that it would define the relationship between each entity for all the projects thereafter?
>
> A. Yes.
>
> Q. Okay. So it wasn't the intention that the document be signed and applied to each separate project, but that it would just govern every project thereafter, correct?
>
> A. Yes. And that's what it should be changed to.

(ECF No. 23-3, PageID.110–111; ECF No. 29-2, PageID.823–824.)

Johnson agreed that under the Agreement, CCN was the "Employer" and Devere was the "Staffed Party." (ECF No. 23-3, PageID.103; ECF No. 29-2, PageID.792.) Johnson also agreed that Orban, Schultz, and Stienke were provided by CCN to Devere under paragraph 2(a), which states that the Employer will provide Assigned Employees to the Staffed Party based on the Staffed Party's request. (*See* ECF No. 23-3, PageID.103; ECF No. 23-6, PageID.196; ECF No. 29-2, PageID.793.) Johnson indicated that, consistent with paragraph 2(b), CCN assigned its employees their wages and provided benefits to them

through the union. (*See* ECF No. 23-3, PageID.103; ECF No. 23-6, PageID.196; ECF No. 29-2, PageID.793–794.) Johnson stated that, in line with paragraph 2(c), CCN did the following for Orban and Schultz: "Pay, withhold, and transmit payroll taxes; provide unemployment insurance and workers' compensation benefits; and handle unemployment and workers' comp[ensation] claims involving the [A]ssigned [E]mployees." (ECF No. 23-3, PageID.103; ECF No. 23-6, PageID.196; ECF No. 29-2, PageID.794.) But Johnson indicated that he did not make Assigned Employees sign Exhibit B to the Agreement, as provided by paragraph 2(d) (*see* ECF No. 23-6, PageID.196), "[b]ecause all of their benefits are provided by the union, I cannot provide them any more." (ECF No. 23-3, PageID.103; ECF No. 29-2, PageID.794–795.) During his deposition, Johnson agreed that "the understanding that [he] had with [him]self, [his] employees and DeVere[ was] that [his] employees would not be entitled to any benefits or anything from DeVere" and "[t]hat all their benefits and the work relationship was through CCN." (ECF No. 23-3, PageID.103; ECF No. 29-2, PageID.795.)

Johnson does not know how Orban and Schultz came to possess the Devere vehicle that was involved in the accident. (*See* ECF No. 23-3,

PageID.104; ECF No. 29-2, PageID.796.) The use of a Devere vehicle is not something that someone would have to run by Johnson or talk to him about. (*See id.*) Johnson testified that when the accident took place, Orban and Schultz were not "on the clock." (ECF No. 23-3, PageID.104; ECF No. 29-2, PageID.798.) Instead, they had chosen to drive home on their own personal time. (*See* ECF No. 23-3, PageID.104; ECF No. 29-2, PageID.797–798.)

## D. The Deposition Testimony of Darwin Stienke, Schultz's Supervisor in Gwinn

Stienke started working at CCN in approximately 2015. (*See* ECF No. 23-5, PageID.167; ECF No. 29-3, PageID.839.) In December 2019, he was a supervisor at the National Carbon plant in Gwinn. (*See* ECF No. 23-5, PageID.168–169; ECF No. 29-3, PageID.840, 843–844.) Prior to that, in 2017, Stienke worked on an Oak City job through CCN. (*See* ECF No. 23-5, PageID.174, 176; ECF No. 29-3, PageID.864, 874.) The Oak City job was the last job Stienke recalled doing through CCN that was not a Devere job. (*See* ECF No. 23-5, PageID.176; ECF No. 29-3, PageID.874–875.)

Stienke testified that CCN's business is to "provide people to different companies. You know, Oak City used to get a job, and they'd

37

get guys from CCN. DeVere Industrial gets guys from CCN." (ECF No. 23-5, PageID.168; ECF No. 29-3, PageID.841.) Stienke stated that Johnson "provides a lot of Union guys to DeVere," and Stienke agreed that CCN has been "the Union side of DeVere" since 2017. (ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.880.) Stienke indicated that Johnson also "bid[s] work" and "has a lot of other projects going on" for which Johnson does "mainly construction management." (ECF No. 23-5, PageID.177; ECF No. 29-3, PageID.879.) In other words, CCN staffs companies that have won a bid to do a certain job at a plant and handles its own contracts. (*See* ECF No. 23-5, PageID.168; ECF No. 29-3, PageID.841–842.) Stienke estimated that CCN had ten to fifteen employees at the time of his deposition. (*See* ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.881.)

CCN and Devere have "divided" offices with separate spaces and "separate entrance[s]" in a "split building." (ECF No. 23-5, PageID.177; ECF No. 29-3, PageID.876.) Employees of both companies "[m]ainly report to work on a daily basis by showing up at "the jobs," but if "[a]ny training or anything like that needs to be done, they come . . . to the

offices." (*Id.*) The employees are trained together for some projects. (*See* ECF No. 23-5, PageID.177; ECF No. 29-3, PageID.877.)

According to Stienke, the only distinctions between employees of CCN and Devere are that (1) "they're employed by different people," and (2) "some are Union, some are not Union." (*Id.*) CCN's employees are "Union members or Union millwrights," and Devere's employees "are not Union members." (ECF No. 23-5, PageID.174; ECF No. 29-3, PageID.866.) CCN provides union employees to Devere and other companies that don't have union employees because CCN "hold[s] the Union contract . . . to be able to pull individuals out of the hall." (ECF No. 23-5, PageID.168; ECF No. 29-3, PageID.843; *see* ECF No. 23-5, PageID.174, 178; ECF No. 29-3, PageID.841, 864, 880.)

Stienke worked at the National Carbon plant in Gwinn starting, most recently, in 2016 or 2017. (*See* ECF No. 23-5, PageID.168; ECF No. 29-3, PageID.842.) The National Carbon plant job was "a DeVere Industrial job," and Stienke was the supervisor of that job "[t]hrough CCN." (ECF No. 23-5, PageID.171; ECF No. 29-3, PageID.855.) When asked during his deposition who decides who will be the supervisor at the National Carbon plant, Stienke responded: "[Crittenden] would or

39

[Johnson], but mainly [Crittenden] would ask [Johnson] to use me up there." (ECF No. 23-5, PageID.175; ECF No. 29-3, PageID.869.)

Stienke supervised all of the CCN and Devere employees who worked at the National Carbon plant. (*See* ECF No. 23-5, PageID.168–169, 174; ECF No. 29-3, PageID.843–844, 865–866.) Stienke indicated that CCN and Devere employees essentially perform the same job "[a]t times" and that a Devere employee did the same work that Orban and Schultz were doing at the Gwinn plant before the accident. (ECF No. 23-5, PageID.174; ECF No. 29-3, PageID.866.) Stienke agreed that he is not required to use union millwrights for the job in Gwinn and that he chose to use them. (*See id.*)

As a supervisor, Stienke had an assigned company vehicle from Devere that was provided by Crittenden and "comes with the job." (ECF No. 23-5, PageID.175; ECF No. 29-3, PageID.868–870; *see* ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.846–847.) No one else in Gwinn had an assigned company vehicle from Devere. (*See* ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.847.) Stienke indicated that CCN owns vehicles, but he has never had a CCN vehicle assigned to him

40

while working for CCN. (*See* ECF No. 23-5, PageID.176, 179; ECF No. 29-3, PageID.873–874, 884.)

At the National Carbon plant in Gwinn, there was no dress code, but the "typical attire" was a "welding coat and stuff like that." (ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.848.) Welding coats were provided by the workers themselves or Steinke would "buy some up there, or DeVere will buy them." (*Id.*) CCN employees supplied their own PPE and items such as hand tools, wrenches, crescent wrenches, and welding hoods. (*See* ECF No. 23-5, PageID.170, 177; ECF No. 29-3, PageID.848–849, 877–878.) Devere provided "the power equipment" that included welders, chainfalls, grinders, and impact wrenches. (ECF No. 23-5, PageID.170, 177; ECF No. 29-3, PageID.848–849, 877.)

Steinke stated that the workers in Gwinn had three or four "apartments rented by the month" that were paid for by Devere because "[i]t was their job." (ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.846.) The apartments were located in the greater Marquette area, and workers could stay there up to two or three weeks at a time. (*See* ECF No. 23-5, PageID.171; ECF No. 29-3, PageID.852.)

41

Because the National Carbon plant project was a Devere job, Stienke "mainly" reported to Crittenden when he was supervising that project. (ECF No. 23-5, PageID.173; ECF No. 29-3, PageID.860.) Stienke elaborated on this reporting during his deposition as follows:

Q. . . . So [Crittenden] kind of directs you as to what not necessarily needs to be done on a day to day basis—

A. Yes.

Q. —but like the overall goal, [Crittenden] is going to say hey, this is what you need to do to make sure your employees are getting this done?

A. Kind of. I mean, he—it's his job, and I kind of do everything up there, you know. He don't—the previous companies we've worked for, they request me back there, so I basically go there under his contract with them. And they want me back up there, so I'm basically up there because they want me up there, you know. So yeah, I mean, I report back to him. It's his equipment up there, you know. It's his work, his welders. All the stuff that's up there is his. So I don't know what's going on. If I need people—

Q. Okay. So—

A. —if I need people from him or from [Johnson], I'll call [Johnson], or else I'll call him, you know.

Q. So would you say you're kind of like the eyes and ears for [Crittenden] up at that plant?

A. Correct.

42

Q. Report back to him, and then once you report back to him, he might say hey, do this, or it sounds great, or whatever might be the case?

A. Yup. Correct.

(ECF No. 23-5, PageID.173; ECF No. 29-3, PageID.860–861.) When Stienke was working in Gwinn, he communicated with Crittenden "all the time" and more than he communicated with Johnson. (ECF No. 23-5, PageID.176; ECF No. 29-3, PageID.875.) If Stienke needed more workers, he first reached out to Crittenden and then reached out to Johnson. (*See* ECF No. 23-5, PageID.177; ECF No. 29-3, PageID.876.)

Stienke could fire employees from the Gwinn job, but Crittenden and Johnson "make th[e] ultimate decision" of firing the person from Devere or CCN. (ECF No. 23-5, PageID.176; ECF No. 29-3, PageID.872–873.) Stienke stated that he would call Crittenden or Johnson to let them know an employee was "fired" and off the National Carbon plant job, but "[w]hat [Crittenden and Johnson] do after that is what they do. I mean, sometimes they'll take my advice. Sometimes they won't, you know." (*Id.*)

As noted, Orban and Schultz were union millwrights who were installing equipment at the plant in Gwinn. (*See* ECF No. 23-5,

PageID.169; ECF No. 29-3, PageID.846.) Stienke decided to have Orban and Schultz work at the Gwinn plant. (*See* ECF No. 23-5, PageID.174–175; ECF No. 29-3, PageID.867–868.) According to Stienke, "I called them to see if they were working, and they weren't working at the time, so they came up there." (*Id.*) No one told Stienke to call them. (*See* ECF No. 23-5, PageID.175; ECF No. 29-3, PageID.868.) Orban and Schultz did not have to undergo any kind of training prior to the Gwinn job. (*See* ECF No. 23-5, PageID.174; ECF No. 29-3, PageID.867.) They worked at the Gwinn plant for approximately three to four months before the accident. (*See* ECF No. 23-5, PageID.175; ECF No. 29-3, PageID.868.)

Steinke indicated that the workweek in Gwinn started on Monday at 7:00 a.m. and ended on Thursday between 3:00 p.m. and 5:30 p.m., and "[s]ometimes we get off a little early." (ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.846; *see* ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.851.) Orban and Schultz were paid by the hour and signed a daily time sheet. (*See* ECF No. 23-5, PageID.169–170, 174; ECF No. 29-3, PageID.847–848, 866–867.) Stienke sent their time sheets to CCN, and then Orban and Schultz were paid their wage. (*See* ECF No. 23-5, PageID.170, 174; ECF No. 29-3, PageID.848, 867.) Stienke agreed that

Orban and Schultz were "W-2 employees of CCN." (ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.848.)

CCN employees received benefits that were paid by CCN (*see* ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.881–882), and CCN provided benefits to Orban and Schultz. (*See* ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.849.) Stienke indicated that the benefits, including health care, are "a package deal" and that CCN was "paying into the Union to have these guys." (ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.882.) The benefits were "through the Union," and CCN "pay[s] into their health care, retirement, and their wage." (ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.849.)

Stienke testified that CCN employees such as Schultz "can pick up and leave. They only—the time they work is what they get paid. You pay by the hour . . . ." (ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.882.) If Schultz decided to leave CCN, CCN would no longer pay his benefits; "[i]t'd be whoever else he's working for" that would cover them. (ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.882–883.)

If Orban or Schultz did not show up to work or perform their job satisfactorily, Stienke disciplined or corrected them. (*See* ECF No. 23-5,

PageID.169; ECF No. 29-3, PageID.847.) Stienke also disciplined Devere employees. (*See* ECF No. 23-5, PageID.175; ECF No. 29-3, PageID.872.) If Orban or Schultz wanted time off, they had to request it from Stienke. (*See* ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.847.) Stienke indicated that he and CCN would have provided things like "an employee manual, or protocols and procedures," to Orban and Schultz that they were expected to follow while working in Gwinn. (ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.849.)

Orban and Schultz worked for CCN in December 2019, but they did not have a contract with CCN. (*See* ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.850.) They were at-will employees who were not committed to working for CCN. (*See id.*) According to Stienke, "they could work wherever they want." (*Id.*) Stienke indicated that when Schultz got into the union, "he could have worked for multiple employe[r]s." (ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.844.) Stienke did not know when Schultz was hired by CCN or if he worked outside of CCN in the few years before the accident. (*See* ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.883.)

46

During his deposition, Stienke agreed that the Reciprocal Employee Staffing Master Agreement's language accurately described the relationship between CCN and Devere in stating that the Agreement "allow[s] one another to provide temporary staffing services to each other from time to time for a limited duration." (ECF No. 23-5, PageID.171; ECF No. 29-3, PageID.853.) Stienke testified that "as we work with DeVere Industrial, I will get people from there to work there, or I'll get people from CCN to work there. I mean, it's the understanding of getting—each company helps each other out." (ECF No. 23-5, PageID.171; ECF No. 29-3, PageID.854.) In Gwinn, CCN provided employees to Devere, so under the Agreement, CCN was the "Employer" and Devere was the "Staffed Party." (ECF No. 23-5, PageID.171–172; ECF No. 29-3, PageID.855–856.)

Stienke indicated that the Employer's duties and responsibilities identified in paragraph 2(a), (b), (c), and (d) of the Agreement were carried out by CCN in Gwinn generally and with respect to Orban and Schultz. (*See* ECF No. 23-5, PageID.172; ECF No. 29-3, PageID.856–858.) However, regarding paragraph 2(d)—which involves Assigned Employees signing agreements "in the form of Exhibit B" (ECF No. 23-

47

6, PageID.196)—Stienke later testified: "No. No, I never—not to my knowledge, nobody signed anything. I mean, if they did, I didn't know about it." (ECF No. 23-5, PageID.174; ECF No. 29-3, PageID.865.) Prior to his deposition, Stienke had never seen the Agreement's Exhibit B. (*See* ECF No. 23-5, PageID.172; ECF No. 29-3, PageID.858.)

Stienke recalled during his deposition that the accident at issue in this case took place on a Thursday. (*See* ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.851.) Stienke stated that Orban and Schultz were not working at the time of the accident because "[w]hen we leave the plant, we're done." (*Id.*) As a result, in his view, Orban and Schultz "were on their personal time" when they were involved in the accident. (ECF No. 23-5, PageID.171; ECF No. 29-3, PageID.852.) Stienke indicated that Orban and Schultz could have spent the weekend at the monthly rental apartments provided by Devere. (*See id.*) Stienke agreed that Orban and Schultz chose to drive home to Alpena "for their own personal reasons." (*Id.*)

## II.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

Defendant seeks summary judgment on the basis that "no factual development could possibly support any obligation on its part to provide no-fault benefits to Jeremie Schultz." (ECF No. 23, PageID.78.) Defendant argues that Mich. Comp. Laws § 500.3114(1) "places [Schultz's] personal insurer, [Plaintiff] Northern Mutual, in the highest order of priority" and that the employer-employee exception in Mich. Comp. Laws § 500.3114(3) does not apply because Schultz was not an employee of Devere at the time of the accident. (*Id.* at PageID.80; *see id.* at PageID.76, 78.) Defendant argues that "under the economic realities test, Jeremie Schultz overwhelmingly should be considered an employee

49

of CCN or at least an independent contractor. None of the factors portends an employer-employee relationship with [Defendant-]insured Devere." (*Id.* at PageID.86.) Defendant also states that CCN is a "separately owned and insured business" from Devere and that the Reciprocal Employee Staffing Master Agreement, which "separates 'employees' from 'assigned employees,' . . . does not establish a relationship beyond that of an independent contractor for the staffed company," which in this case is Devere. (*Id.* at PageID.76–77.)

In its response, Plaintiff argues that Schultz "should be labeled an employee of Devere and all PIP benefits should be the responsibility of [Defendant]" under Mich. Comp. Laws § 500.3114(3). (ECF No. 29, PageID.687.) Plaintiff states that "Michigan courts utilize the common law 'Economic Realities Test' to determine the relationship between an employer/employee and looking at the application as to No-Fault insurers." (*Id.* at PageID.685.) Plaintiff argues that

> CCN does not technically employ any of the union millwrights based upon the Economic Realities Test . . . , but simply act [sic] as almost a temp agency as the union millwrights are in no way bound to CCN and can obtain any and all work without the assistance of CCN.

(*Id.* at PageID.683 (internal citation omitted).) Plaintiff states that Crittenden, Johnson, and Stienke "acknowledged that CCN was the 'union arm' of Devere Industrial." (*Id.*) Plaintiff argues that "CCN is essentially a labor broker, or the union arm of Devere," because Orban and Schultz worked exclusively on Devere projects "while at CCN" and because Stienke, their supervisor, was a CCN employee who "had worked exclusively for Devere since 2017, though continued to be an 'employee' of CCN." (*Id.* at PageID.687.) According to Plaintiff, the Reciprocal Employee Staffing Master Agreement "does not determine the status of an individual as to whether or not they are an employee of a company and/or independent contractor." (*Id.* at PageID.685.)

In other words, the parties disagree as to which of them is first in priority to pay Schultz PIP benefits under the No-Fault Act. Defendant argues that Plaintiff is first in priority under Mich. Comp. Laws § 500.3114(1). (*See* ECF No. 23, PageID.80–82.) Plaintiff argues that Defendant is first in priority under Mich. Comp. Laws § 500.3114(3). (*See* ECF No. 29, PageID.682, 686–688.) Whether Mich. Comp. Laws § 500.3114(3) applies depends on if Schultz was an employee of Devere under the economic reality test.

## A.   Priority of Insurers Liable for PIP Benefits Under the Michigan No-Fault Act (Mich. Comp. Laws § 500.3114)

"When determining the priority of insurers liable for no-fault PIP benefits, courts must examine MCL 500.3114." *Duckworth v. Cherokee Ins. Co.*, 333 Mich. App. 202, 210–11 (2020) (quoting *Corwin v. DaimlerChrysler Ins. Co.*, 296 Mich. App. 242, 254 (2012)). Under Mich. Comp. Laws § 500.3114(1),[9] "the general rule is that one looks to a person's own insurer for no-fault benefits unless one of the statutory exceptions, [MCL 500.3114(2), (3), and (5)], applies." *Miclea v. Cherokee Ins. Co.*, 333 Mich. App. 661, 668 (2020) (alteration in original) (quoting *Parks v. Detroit Auto. Inter-Ins. Exch.*, 426 Mich. 191, 202–03 (1986)), *appeal denied*, 959 N.W.2d 537 (Mich. 2021); *see Duckworth*, 333 Mich. App. at 211. The exception found at Mich. Comp. Laws § 500.3114(3)[10]

---

[9] Mich. Comp. Laws § 500.3114(1) provides in relevant part:

Except as provided in subsections (2), (3), and (5), a personal protection insurance policy described in section 3101(1) applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either domiciled in the same household, if the injury arises from a motor vehicle accident.

Mich. Comp. Laws § 500.3114(1) (footnote omitted).

[10] Mich. Comp. Laws § 500.3114(3) states:

provides, in general, that an employee who suffers accidental bodily injury while an occupant of a motor vehicle owned or registered by the employer is to receive PIP benefits from the insurer of the furnished vehicle. . . . Importantly, the cases interpreting MCL 500.3114(3) "have given it a broad reading designed to allocate the cost of injuries resulting from use of business vehicles to the business involved through the premiums it pays for insurance." *Id.* at 89, 549 N.W.2d 834.

*Toduti v. Progressive Mich. Ins. Co.*, No. 352716, 2021 WL 4001802, at *3 (Mich. Ct. App. Sept. 2, 2021). "The no-fault act does not expressly define 'employer' or 'employee.'" *Miclea*, 333 Mich. App. at 669. "An independent contractor is not considered an 'employee' for purposes of the no-fault act." *Adanalic v. Harco Nat. Ins. Co.*, 309 Mich. App. 173, 191 (2015) (citing *Citizens Ins. Co. of Am. v. Auto. Club Ins. Ass'n*, 179 Mich. App. 461, 465 (1989)).

## B.   The Economic Reality Test

Michigan courts "apply the economic reality test to determine whether an employment relationship exists under the no-fault act."

---

An employee, his or her spouse, or a relative of either domiciled in the same household, who suffers accidental bodily injury while an occupant of a motor vehicle owned or registered by the employer, shall receive personal protection insurance benefits to which the employee is entitled from the insurer of the furnished vehicle.

Mich. Comp. Laws § 500.3114(3).

*Dairyland Ins. Co. v. Amerisure Ins. Co.*, No. 308452, 2013 WL 1748572, at *2 (Mich. Ct. App. Apr. 23, 2013) (citing *Parham v. Preferred Risk Mut. Ins. Co.*, 124 Mich. App. 618, 624 (1983)); *see Anwar v. Dow Chem. Co.*, 876 F.3d 841, 853 (6th Cir. 2017) ("To determine whether an employment relationship exists, Michigan courts use the 'economic realities test.'" (quoting *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 843–44 (E.D. Mich. 2012))). "The goal is to determine whether an individual or entity is the 'employer' of a given employee." *Anwar*, 876 F.3d at 853 (citing *Clark v. United Techs. Auto., Inc.*, 459 Mich. 681, 686–88 (1999)).

In its summary judgment motion, Defendant states that

[p]ursuant to the "economic-realities test," the factors to be considered are: "(1) control of the worker's duties; (2) payment of wages; (3) right to hire, fire and discipline; and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal." *Parham* at 623. Michigan courts have also found other relevant factors in determining the nature of an employer-employee relationship beyond the principle [sic] factors defined in *Parham*, including, (1) whether the individual furnishes his own equipment, (2) whether the individual holds himself out to the public for hire, and (3) whether independent contractors customarily perform the undertaking. *McKissic v Bodine*, 42 Mich App 203201 NW2d 333 (1972).

54

(ECF No. 23, PageID.85–86.) Plaintiff lists the same economic reality test factors in its response. (*See* ECF No. 29, PageID.687–688, 692.)

Michigan courts have applied the economic reality test using the factors identified by the parties in their filings. *See Van Lieu v. Farm Bureau Gen. Ins. Co. of Mich.*, No. 330014, 2017 WL 786949, at *3 (Mich. Ct. App. Feb. 28, 2017) (stating that "[f]or purposes of MCL 500.3114(3), whether an injured party was an employee is determined by applying the economic reality test" and indicating that "[t]he economic reality test requires the court to consider" the seven factors identified by the parties in this case); *Etheridge v. JJ Curran Crane Co.*, No. 356775, 2022 WL 497352, at *2 (Mich. Ct. App. Feb. 17, 2022); *Toduti*, 2021 WL 4001802, at *3; *Bolen v. Marada Indus., Inc.*, No. 348765, 2021 WL 641709, at *5–6 (Mich. Ct. App. Feb. 18, 2021), *appeal denied*, 508 Mich. 945 (2021), *reconsideration denied*, 967 N.W.2d 610 (Mich. 2022); *Doe v. Grand Co., LLC*, No. 18-cv-13123, 2020 WL 806031, at *12 (E.D. Mich. Feb. 18, 2020); *Vojnika v. State Farm Mut. Auto. Ins. Co.*, No. 331470, 2017 WL 2704905, at *2 (Mich. Ct. App. June 22, 2017); *Farm Bureau Gen. Ins. Co. of Am. v. Westfield Ins. Co.*, No. 330961, 2017 WL 2348747, at *4 & n.1 (Mich. Ct. App. May 30, 2017);

*Marougi v. Auto Club Ins. Ass'n*, No. 322120, 2015 WL 6439785, at \*2 (Mich. Ct. App. Oct. 22, 2015).

The Michigan Court of Appeals recently held in *Duckworth v. Cherokee Ins. Co.* that when applying the economic reality test in the context of the No-Fault Act, the factors from a few cases should be considered: (1) *Parham v. Preferred Risk Mut. Ins. Co.*, 124 Mich. App. 618 (1983), and/or *Adanalic v. Harco Nat. Ins. Co.*, 309 Mich. App. 173 (2015), and (2) *McKissic v. Bodine*, 42 Mich. App. 203 (1972). *See Duckworth*, 333 Mich. App. at 213–14. The Michigan Court of Appeals stated in *Duckworth* that

> [i]n *Parham v. Preferred Risk Mut. Ins. Co.*, 124 Mich. App. 618, 619-620, 335 N.W.2d 106 (1983), we adopted the economic-reality test to determine when the injured party was an employee for purposes of MCL 500.3114(3). We stated that the factors to be considered under that test "*include*: (a) control of the worker's duties, (b) payment of wages, (c) right to hire, fire and discipline, and (d) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal." *Id.* at 623, 335 N.W.2d 106 (emphasis added). We recited the same nonexhaustive factors in *Adanalic*, 309 Mich. App. at 191, 870 N.W.2d 731. While we have routinely cited these four general factors, we have also recognized that "[n]o single factor is controlling and, indeed, the list of factors is nonexclusive and other factors may be considered as each individual case requires." *Rakowski v. Sarb*, 269

Mich. App. 619, 625, 713 N.W.2d 787 (2006). See also *Chilingirian v. City of Fraser*, 194 Mich. App. 65, 69, 486 N.W.2d 347 (1992) ("The economic reality test looks to the totality of the circumstances surrounding the work performed.").

In *McKissic v. Bodine*, 42 Mich. App. 203, 208-209, 201 N.W.2d 333 (1972), a worker's compensation case, this Court discerned from caselaw a more comprehensive list of eight factors "for determining the nature of the existing relationship between a given employer and employee":

> First, what liability, if any, does the employer incur in the event of the termination of the relationship at will?

> Second, is the work being performed an integral part of the employer's business which contributes to the accomplishment of a common objective?

> Third, is the position or job of such a nature that the employee primarily depends upon the emolument for payment of his living expenses?

> Fourth, does the employee furnish his own equipment and materials?

> Fifth, does the individual seeking employment hold himself out to the public as one ready and able to perform tasks of a given nature?

> Sixth, is the work or the undertaking in question customarily performed by an individual as an independent contractor?

Seventh, control, although abandoned as an exclusive criterion upon which the relationship can be determined, is a factor to be considered along with payment of wages, maintenance of discipline and the right to engage or discharge employees.

Eighth, weight should be given to those factors which will most favorably effectuate the objectives of the statute.

The Supreme Court has cited *McKissic* with approval, see *Askew v. Macomber*, 398 Mich. 212, 217 n.7, 247 N.W.2d 288 (1976), and most recently applied the eight factors, rather than merely four, in *Coblentz v. Novi*, 475 Mich. 558, 578-580, 719 N.W.2d 73 (2006), to determine whether the defendant city's attorney was an employee or independent contractor for purposes of the Freedom of Information Act, MCL 15.231 *et seq.*

Progressive[, the personal no-fault insurer of the plaintiff in *Duckworth*,] argues for consideration of the *McKissic* factors, while Cherokee[, the defendant in *Duckworth* and no-fault insurer of the tractor truck involved in the accident,] maintains that we are confined to the four more general factors. This Court has recognized the varying formulations of the economic-reality test and concluded that "[t]he tests are basically the same and each provides a rational framework." *Williams v. Cleveland Cliffs Iron Co.*, 190 Mich. App. 624, 627, 476 N.W.2d 414 (1991). Indeed, there is substantial overlap between the two tests, which share common origins in worker's compensation cases. At the same time, the *McKissic* factors are particularly applicable when the nature of the relationship is at issue, i.e., whether the

worker is an employee or an independent contractor. *McKissic*, 42 Mich. App. at 208, 201 N.W.2d 333. We have always recognized that the four factors discussed in *Parham* and *Adanalic* are not exhaustive, and the *McKissic* factors are consistent with those set forth in *Adanalic* and provide additional clarity. And both the four-factor and the eight-factor tests have been applied by the Supreme Court. Accordingly, we conclude that the *McKissic* factors should be considered as well as those noted in *Adanalic* when determining whether a worker is an employee or independent contractor under the no-fault act.

*Duckworth*, 333 Mich. App. at 211–14 (emphasis in original) (footnotes omitted).

The Michigan Court of Appeals indicates that "one can have dual or co-employers. In those cases, 'the employee typically has a readily identifiable "legal" or "actual" employer . . . and the dispositive question is whether, under the economic realities test, a second entity can also be classified as an employer . . . .'" *Toduti*, 2021 WL 4001802, at *3 (alterations in original) (quoting *Clark*, 459 Mich. at 689). As noted, "[i]n applying the economic reality factors, the totality of the circumstances surrounding the work must be examined." *Id.* (quoting *James v. Commercial Carriers, Inc.*, 230 Mich. App. 533, 537 (1998)).

## C.   Application of the Economic Reality Test

In this opinion and order, the Court analyzes the factors from *Adanalic* and *McKissic*, which the Michigan Court of Appeals instructs in *Duckworth* "should be considered . . . when determining whether a worker is an employee or independent contractor under the no-fault act." *Duckworth*, 333 Mich. App. at 213–14. The factors identified by the Michigan Court of Appeals in *Duckworth*, a published opinion that was issued on August 6, 2020, overlap with the seven economic reality test factors referenced by the parties in their filings. Moreover, Defendant argues that under the economic reality test, there is no "employer-employee relationship" between Devere and Schultz; rather, Schultz "overwhelmingly should be considered an employee of CCN or at least an independent contractor." (ECF No. 23, PageID.86; *see id.* at PageID.76–77.) Regardless of whether the Court applies the factors identified by the parties in their filings or those identified by the Michigan Court of Appeals in *Duckworth*, the economic reality test's analysis and outcome are largely the same in this case.[11]

---

[11] Because the economic reality test factors the parties analyzed in their filings overlap a great deal with the *Adanalic* and *McKissic* factors identified by the Michigan Court of Appeals in *Duckworth*, the Court does not need supplemental

In analyzing the *Adanalic* and *McKissic* factors, the Court takes the same approach that the Michigan Court of Appeals took in *Duckworth*: "In applying the economic-reality test to this case, we will first analyze the four *Adanalic* factors, which overlap with the first, second, and seventh *McKissic* factors." *Duckworth*, 333 Mich. App. at 214. The remaining *McKissic* factors are then discussed. *See id.* at 216–17.

### i.   *First* Adanalic *Factor: Control of the Worker's Duties*

Regarding the first *Adanalic* factor—control of the worker's duties—Defendant asserts in its motion that Schultz is "under the control of CCN for his duties," but Defendant does not explain how it reached this conclusion. (ECF No. 23, PageID.86; *see* ECF No. 30, PageID.892.) In its response, Plaintiff argues that Devere controlled Schultz's job duties because it held the contract with the National Carbon plant. (*See* ECF No. 29, PageID.689.) Plaintiff argues that Crittenden "had the ultimate say-so in the direction of the job and how it would be conducted" (*id.*) and that Stienke supervised union and non-

---

briefing from the parties. The Court nevertheless gave counsel an opportunity to address the *Adanalic* and *McKissic* factors during the hearing on January 20, 2022, and the Court considers their arguments in this opinion and order.

union millwrights, who "did the same jobs and worked together under his direction via Chris Crittenden of Devere." (*Id.* at PageID.690.) Plaintiff argues that "[i]t cannot be disputed that Chris Crittenden controlled the workers' duties through Darwin Stienke as his supervisor. Relative to this job, Darwin Stienke took all direction from Chris Crittenden, communicated with Chris Crittenden and drove a Devere vehicle." (*Id.*; *see id.* at PageID.689.) Plaintiff states that "for all intents and purposes, [Stienke] was working as an employee of Devere," and he reported to Crittenden because "it was Devere's job, Devere's equipment and [Stienke] was Mr. Crittenden's eyes and ears on site." (*Id.* at PageID.689–690.)

There is evidence in the record that CCN controlled Schultz's job duties. Johnson testified that he was Schultz's boss and was responsible for disciplining Schultz, guiding Schultz, and making sure Schultz was getting paid. (*See* ECF No. 23-3, PageID.102–103; ECF No. 29-2, PageID.790–791.) Crittenden indicated that no one from Devere had "any day-to-day supervision or any kind of involvement with CCN employees on a day-to-day basis while they're up in Gwinn." (ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.714.) Crittenden also indicated

that CCN provided "appropriate information, training, and safety equipment."[12] (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.727.) Furthermore, paragraph 3(d) of the Agreement states that the Staffed Party (Devere) will "not change Assigned Employees' job duties without express prior written approval from Employer" (CCN). (ECF No. 23-6, PageID.196.) This supports a finding that CCN had control over Schultz's job duties.

However, there is also evidence that supports a finding that Devere had control over Schultz's job duties. Paragraph 2(a) of the Agreement states that Assigned Employees perform work "under Staffed Party's [(Devere's)] supervision," and paragraph 3(a) states that the Staffed Party (Devere) will "properly supervise Assigned Employees performing its work." (*Id.*)

In addition to paragraphs 2(a) and 3(a) of the Agreement, other evidence viewed in a light most favorable to Plaintiff supports a finding

---

[12] At the same time, paragraph 3(c) of the Agreement states that Devere will "provide Assigned Employees with a safe work site and provide appropriate information, training, and safety equipment with respect to any hazardous substances or conditions to which they may be exposed at the work site." (ECF No. 23-6, PageID.196.) But Crittenden indicated that this language did not apply in Gwinn because there were "no hazardous substances or conditions to which they may be exposed at th[at] work site." (*Id.*; *see* ECF No. 23-4, PageID.132–133; ECF No. 29-1, PageID.726–727.)

that Devere had control over Schultz's job duties. As Plaintiff notes, Schultz was supervised by Stienke in Gwinn. Crittenden testified that by making Stienke the supervisor, Stienke had control over Assigned Employees, which included Schultz. (*See* ECF No. 23-4, PageID.132; ECF No. 29-1, PageID.725–726.) Stienke testified that he decided to have Schultz work at the Gwinn plant (*see* ECF No. 23-5, PageID.174–175; ECF No. 29-3, PageID.867–868), and Stienke could fire employees such as Schultz from the Gwinn job. (*See* ECF No. 23-5, PageID.176; ECF No. 29-3, PageID.872–873.) Stienke oversaw the workers' use of equipment and supplies, including PPE, at the National Carbon plant. (*See* ECF No. 23-4, PageID.130, 133; ECF No. 29-1, PageID.715, 727.) Stinke disciplined or corrected Schultz if there were issues with Schultz's job attendance or performance, and Schultz had to request time off from Stienke. (*See* ECF No. 23-4, PageID.130; ECF No. 23-5, PageID.169; ECF No. 29-1, PageID.716–717; ECF No. 29-3, PageID.847.)

Stienke was a CCN employee, but he regularly reported to Crittenden and took direction from Crittenden, including direction on what needed to be done, because the job in Gwinn was a Devere job.

(*See* ECF No. 23-3, PageID.102, 108; ECF No. 23-5, PageID.173; ECF No. 29-2, PageID.790, 812; ECF No. 29-3, PageID.860–861.) Johnson agreed that "for all intents and purposes while there, [Stienke] was working for [Crittenden]." (ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.812.) Stienke acted as Crittenden's "eyes and ears" at the National Carbon plant. (ECF No. 23-5, PageID.173; ECF No. 29-3, PageID.860–861.) As the supervisor of the Devere job in Gwinn, Stienke was given a Devere vehicle. (*See* ECF No. 23-5, PageID.169, 175; ECF No. 29-3, PageID.846–847, 868–870.) No one else in Gwinn had an assigned company vehicle from Devere. (*See* ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.847.) Stienke was picked by Crittenden to supervise Devere's job at the National Carbon plant because of his familiarity with that plant (*see* ECF No. 23-4, PageID.129; ECF No. 29-1, PageID.713–714), but all other Devere jobs were supervised by Devere employees. (*See* ECF No. 23-4, PageID.138; ECF No. 29-1, PageID.749.) Based on this evidence, it is possible to conclude that Devere controlled Schultz's job duties through Stienke's supervision of Schultz.

Additional evidence supports the conclusion that Devere controlled Schultz's job duties. Johnson testified that those who had supervisor responsibility over Schultz included himself, Stienke, "[t]he owner of DeVere, who they were working for, any of the DeVere supervisors could direct us." (ECF No. 23-3, PageID.102; ECF No. 29-2, PageID.790.) Crittenden testified that Johnson "ha[d] no involvement with th[e] facility" in Gwinn apart from signing the Agreement. (ECF No. 23-4, PageID.131; ECF No. 29-1, PageID.721.) Schultz did not show up for work at CCN's office or shop daily (*see* ECF No. 23-3, PageID.106, 109; ECF No. 29-2, PageID.805, 818); rather, he went directly to Devere's job site. (*See* ECF No. 23-3, PageID.109; ECF No. 29-2, PageID.818.) Stienke indicated that he and CCN provided things like "an employee manual, or protocols and procedures," to Schultz that Schultz was expected to follow while working in Gwinn. (ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.849.) According to Crittenden, however, both Devere and CCN established the policies and protocols for workers to follow at the Gwinn plant. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) Therefore, a reasonable jury

66

could conclude that Devere had control over Schultz's job duties, which favors a finding that Schultz was an employee of Devere.

### ii.  *Second* Adanalic *Factor: Payment of Wages*

As to the second *Adanalic* factor—payment of wages—Defendant states in its motion that CCN paid Schultz's wages, but it provides no analysis regarding this issue. (*See* ECF No. 23, PageID.86; ECF No. 30, PageID.891.) Plaintiff's argument with respect to the payment of wages is as follows:

> It is not disputed that the union millwrights were paid out of an account held by CCN. However, there is also no dispute that it was simply a pass-through wherein all union millwrights' time would be billed to Devere Industrial by CCN, with CCN simply adding a percent as their fee. Exhibit B - DTBJ [Deposition Transcript of Brock Johnson]; pp. 35, line 1-6; pp. 35, line 23 through pp. 36, line 3.

> CCN does not set the wage that will be paid to the union millwrights, but that being dictated by the union and paid by Devere Industrial.

(ECF No. 29, PageID.690.)

In this case, there is evidence that shows that CCN paid Schultz's wages. Johnson testified that CCN paid Schultz's wages. (*See* ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.808.) CCN paid Schultz weekly "[o]r whatever the agreement is with [his] particular union." (ECF No.

23-3, PageID.107; ECF No. 29-2, PageID.809.) Johnson testified that CCN employees received benefits through CCN (*see* ECF No. 23-3, PageID.103; ECF No. 29-2, PageID.795) and that "[t]he union provides the benefits." (ECF No 23-3, PageID.102–103; ECF No. 29-2, PageID.791, 793–795.)

Crittenden indicated that the paychecks of CCN employees working in Gwinn came from CCN. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) Crittenden was unaware of how CCN employees are compensated because "[t]hey're employed by CCN." (ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.718.) He stated that Devere did not provide benefits—such as workers' compensation, health insurance, or bonuses—to CCN employees working in Gwinn. (*See id.*) Crittenden indicated that Devere does not pay taxes for CCN or CCN's employees. (*See* ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.729.)

In addition, Stienke agreed that Schultz was a "W-2 employee[ ] of CCN." (ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.848.) Schultz was paid by the hour and recorded his hours in daily time sheets that Stienke sent to CCN so that Schultz was paid his wage. (*See* ECF No. 23-5, PageID.169–170, 174; ECF No. 29-3, PageID.847–848, 866–867.)

Stienke indicated that CCN provided benefits to Schultz. (*See* ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.849.)

Moreover, paragraph 2(b) of the Agreement states that the Employer (CCN) will "pay Assigned Employees' wages and provide them with the benefits that Employer offers to them." (ECF No. 23-6, PageID.196.) Paragraph 2(c) of the Agreement states that the Employer (CCN) will "pay, withhold, and transmit payroll taxes; provide unemployment insurance and workers' compensation benefits; and handle unemployment and workers' compensation claims involving Assigned Employees." (*Id.*) Johnson indicated that, as provided by paragraph 2(b), CCN assigned its employees their wages and provided benefits to them through the union. (*See* ECF No. 23-3, PageID.103; ECF No. 29-2, PageID.793–794.) Johnson also indicated that CCN complied with paragraph 2(c) with respect to Schultz. (*See* ECF No. 23-3, PageID.103; ECF No. 29-2, PageID.794.) Crittenden agreed that CCN was responsible for the duties listed in paragraph 2(b) and (c) of the Agreement. (*See* ECF No. 23-4, PageID.132; ECF No. 29-1, PageID.723–724.) Stienke indicated that the duties in paragraph 2(b) and (c) were carried out by CCN in Gwinn generally and with respect to Schultz.

69

(*See* ECF No. 23-5, PageID.172; ECF No. 29-3, PageID.856–858.) This evidence supports a finding that CCN paid Schultz's wages.

In its response to Defendant's summary judgment motion, Plaintiff does not dispute that CCN paid Schultz's wages. (*See* ECF No. 29, PageID.690.) But it argues that CCN "was simply a pass-through" because CCN billed Devere for "all union millwrights' time," and "CCN simply add[ed] a percent as [its] fee." (*Id.*) Plaintiff states that CCN did not set union millwrights' wages and that the wages were "dictated by the union and paid by Devere." (*Id.*) Plaintiff does not cite to any authority that demonstrates that Devere paid Schultz's wages by paying CCN for its services.

It is possible to conclude that Devere paid Schultz's wages if a labor broker relationship existed between Devere and CCN. Plaintiff argues in its response that "CCN is essentially a labor broker, or the union arm of Devere," because Orban and Schultz worked exclusively on Devere projects through CCN and because Stienke was a CCN employee who "had worked exclusively for Devere since 2017." (ECF No. 29, PageID.687.) In its reply, Defendant does not dispute Plaintiff's characterization of CCN as a labor broker.

70

"A labor broker is a company engaged in the business of furnishing employees to others." *Papczynski v. Pioneer Hi-Bred Int'l, Inc.*, No. 1:16-cv-179, 2017 WL 4900356, at *3 (W.D. Mich. June 27, 2017) (citing *Farrell v. Dearborn Mfg. Co.*, 416 Mich. 267, 271–72 (1982)). The Michigan Court of Appeals indicates that

> [a] labor broker situation involves one company that hires a worker and assigns that worker out to another company. *Farrell*, 416 Mich. at 274. Generally, labor brokers are "engaged in the business of supplying personnel on a temporary basis to commercial and industrial companies." *Id.* at 275. "The customers of a labor broker *typically* call in their employment needs on a daily basis, and workers are sent by the broker to fill these needs." *Id.* (emphasis added). Once at the customer's place of business, "the worker is subject to the control and authority of the customer and the customer's supervisory personnel" and the customer can "discharge the employee from the daily work assignment and can refuse to accept a worker sent by the broker." *Id.* Further, "the customer does not pay the employee directly." *Id.* Instead, "the labor broker pays the employee and includes as part of its charge to the customer amounts to cover its expenses for compensation premiums, social security and other taxes." *Id.* at 275-276.

*Bolen*, 2021 WL 641709, at *5.

The Michigan Court of Appeals' definition of a "labor broker situation" appears to apply to the relationship between Devere and

CCN.[13] As noted, CCN contracted employees and provided them to Devere on a temporary basis. (*See* ECF No. 23-3, PageID.107; ECF No. 23-5, PageID.171; ECF No. 29-2, PageID.809–810; ECF No. 29-3, PageID.853.) Crittenden requested employees from Johnson (*see* ECF No. 23-4, PageID.139; ECF No. 29-1, PageID.754), and Johnson then supplied workers to Crittenden. The CCN employees who were assigned to work in Gwinn, such as Schultz, were "subject to the control and authority" of Crittenden and Stienke, the supervisor of Devere's project in Gwinn, as noted above. *Bolen*, 2021 WL 641709, at *5. Stienke could remove CCN workers, including Schultz, from the job. (*See* ECF No. 23-5, PageID.176; ECF No. 29-3, PageID.872–873.) CCN billed Devere for the hours worked by CCN's employees every week, plus a percentage, and Devere paid CCN on a monthly basis. (*See* ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.808–809.) Johnson agreed during his deposition that CCN's role in Gwinn resembled that of a "temp agency" by "contracting employees and simply providing them and

---

[13] Even if a "labor broker situation" does not exist between Devere and CCN and the labor broker analysis above is inapplicable to this case, the Court still finds it appropriate to deny Defendant's summary judgment motion because a reasonable jury can conclude that other economic reality test factors favor a finding of an employment relationship between Devere and Schultz.

paying them a wage." (ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.809–810.) In addition to paying its employees' wages, CCN provided its employees with benefits, handled their payroll taxes, provided unemployment insurance and workers' compensation benefits, and handled unemployment and workers' compensation claims.[14] (*See* ECF No. 23-3, PageID.103; ECF No. 29-2, PageID.794.)

Courts applying Michigan law have concluded that in labor broker relationships in which the customer of a labor broker contributes to the payment of an hourly laborer's wages, the second factor of the economic reality test regarding the payment of wages favors a finding of an employment relationship between the labor broker's customer and the laborer. In *Grubish v. State Farm Mut. Auto. Ins. Co.*, the plaintiff "was paid by ACI Group Ltd., and assigned to install an underground cable for Advanced Communications, Inc. . . . at the time of the accident" at issue in the case. No. 183116, 1997 WL 33354642, at *1 (Mich. Ct. App. Feb. 7, 1997). The Michigan Court of Appeals concluded that "Advanced

---

[14] The evidence in the record does not indicate how much CCN charged Devere for its employees' labor or whether the amount CCN charged Devere covered CCN's expenses for the compensation of its employees (beyond its employees' hourly wages). But a "labor broker situation" between CCN and Devere may be found viewing the evidence discussed above in a light most favorable to Plaintiff.

Communications was [the plaintiff's] employer for purposes of the no-fault act['s]" employer-employee exception, in part because the economic reality test's second factor regarding payment of wages supported "the finding of an employer-employee relationship." *Id.* at *4. The court analyzed the second factor of the economic reality test as follows: "Although ACI Group actually paid plaintiff, it was reimbursed by Advanced Communications for all employment related costs and simply received a flat fee for what were essentially accounting services." *Id.* (citing *White v. Central Transport, Inc.*, 150 Mich. App. 128, 131 (1986); *Tolbert v. U.S. Truck Co.*, 179 Mich. App. 471, 476 (1989)).

In *Papczynski v. Pioneer Hi-Bred Int'l, Inc.*, a Workers' Disability Compensation Act ("WDCA") case, Mich. Comp. Laws § 481.131(1),[15] the

---

[15] "[C]ourts look to the economic-reality test to 'determine whether an employment relationship exists for the purposes of the [Workers' Disability Compensation Act's ("WDCA")] exclusive[-]remedy provision.'" *Etheridge v. JJ Curran Crane Co.*, No. 356775, 2022 WL 497352, at *2 (Mich. Ct. App. Feb. 17, 2022) (last alteration in original) (quoting *Clark v. United Techs. Auto., Inc.*, 459 Mich. 681, 687 (1999)); *see Bolen v. Marada Indus., Inc.*, No. 348765, 2021 WL 641709, at *6 (Mich. Ct. App. Feb. 18, 2021) (stating that "the economic reality test is evaluated in all cases involving a second entity seeking the protection of the exclusive remedy provision under MCL 418.131(1)"), *appeal denied*, 508 Mich. 945 (2021), *reconsideration denied*, 967 N.W.2d 610 (Mich. 2022).

In conducting its own research on the second economic reality test factor, the Court found no indication that the analysis of this factor differs depending on whether the economic reality test is being applied in a WDCA case or a No-Fault Act case. In *Grubish v. State Farm Mut. Auto. Ins. Co.*, the No-Fault Act case discussed above, the Michigan Court of Appeals noted that Michigan courts "have

court analyzed the second economic reality test factor involving the payment of wages as follows:

> [T]he payment of Plaintiff's wages indicates that both Defendant and KW [Maintenance Services, LLC ("KW")] were Plaintiff's employers. KW paid Plaintiff his wages and provided him benefits; however, KW charged Defendant for providing it with Plaintiff's services, and, as a contractual obligation, Defendant required that KW maintain worker's compensation insurance for injuries that occurred on the job. The economic reality is that Defendant paid Plaintiff through KW. Which entity writes the checks is not dispositive of the employment relationship. *Kidder*, 564 N.W.2d at 881; *Thompson*, 1999 WL 33435459, at *2.

*Papczynski*, 2017 WL 4900356, at *4.

In *Bolen v. Marada Indus., Inc.*, a different case brought under the WDCA, the plaintiff suffered injuries "while employed as an inspector by ATCO Industries, Inc. (ATCO), and performing her job at defendant's facility." 2021 WL 641709, at *1. Prior to the plaintiff sustaining injuries, the defendant entered into a "Service Agreement" with ATCO. *See id.* The defendant "paid ATCO $29.50 per hour for project coordinators (like plaintiff), and ATCO then deducted its profit,

---

generally held that an employee of a labor broker is also an employee of the broker's customer for purposes of the exclusive remedy provision of the worker's disability compensation act." No. 183116, 1997 WL 33354642, at *4 (Mich. Ct. App. Feb. 7, 1997).

taxes, and costs for insurance, before it paid its own employees." *Id.* at

*5. In reviewing the trial court's application of the economic reality test,

the Michigan Court of Appeals found that

> the trial court did erroneously conclude there was a "lack[ ]
> of sufficient evidence to draw a legal conclusion" regarding
> the second factor of the economic reality test, the payment of
> wages. The trial court concluded that while it was
> "undisputed that ATCO paid Plaintiff's wages," it recognized
> defendant's argument that plaintiff's "wages essentially
> came from" defendant because defendant paid ATCO for
> plaintiff's services. Noting the conflicting nature of *Kidder*,
> 455 Mich. at 41, and *Clark*, 459 Mich. at 695-696, with
> respect to which entity paid the respective plaintiff's wages,
> the trial court found that it was "unclear which company
> was actually responsible for" paying plaintiff's wages. As a
> result, the trial court concluded it "lack[ed] sufficient
> evidence to draw a legal conclusion with regard to the
> payment of Plaintiff's wages."

> While it is true that ATCO paid plaintiff ($14.45 per hour), it
> was undisputed that defendant paid ATCO $29.50 for every
> hour plaintiff worked for defendant during the inspection
> process. Thus, had defendant not paid ATCO the $29.50 per
> hour that plaintiff worked, plaintiff would not have received
> her wages from ATCO. Additionally, [Dan] Kendzior[,
> ATCO's Director of Business Development,] testified that
> from that $29.50, ATCO deducted money for insurance and
> taxes before paying its employees. Like in *Kidder*, the fact
> defendant did not directly pay plaintiff or the other
> inspectors "is a distinction without a difference" because
> ATCO, like the labor broker in *Kidder*, "was a payment

76

conduit" for defendant. Defendant paid ATCO $29.50 per hour for time plaintiff and the other inspectors worked, with $14.45 of that going to plaintiff, and the remaining being deducted for taxes and insurance. Thus, defendant contributed to the payment of plaintiff's wages and, contrary to the trial court's conclusion, this factor favors a finding defendant was an employer of plaintiff.

*Id.* at *7 (first two alterations in original).

In *Etheridge v. JJ Curran Crane Co.*, which is also a WDCA case, the Michigan Court of Appeals found that

[w]ith respect to the second economic-reality factor, the payment of [an individual's] wages, it is undisputed [the individual's] checks came from defendant. However, "who writes the check is not dispositive of the employer-employee relationship," especially considering Ferraro[, an entity that had contracted with the defendant,] paid defendant for each hour [the individual] worked on the job. See *Kidder*, 455 Mich at 44. It is generally understood in labor-broker relationships that, "[b]y engaging the services of the labor broker, the customer [knows] that, in exchange for a set fee, the broker would pay the employees, handle all paperwork, and provide compensation coverage." *Farrell*, 416 Mich at 277. Thus, Ferraro's payment for [the individual's] work merely passed through defendant. To say [the individual's] wages came from defendant ignores the economic reality of the situation—the money to pay those wages came from Ferraro, which also received the benefit of [the individual's] work.

2022 WL 497352, at *3.

In light of the cases discussed above, it is possible to conclude that CCN and Devere had a labor broker relationship and that Devere paid Schultz's wages. CCN charged Devere for the hours its employees, including Schultz, worked (based on a set rate plus a percentage), and CCN had a contractual obligation to handle payroll taxes and to maintain unemployment and workers' compensation insurance for its employees. (*See* ECF No. 23-3, PageID.102, 107; ECF No. 23-4, PageID.139; ECF No. 23-6, PageID.196; ECF No. 29-1, PageID.753; ECF No. 29-2, PageID.788, 808–809.) *See also Etheridge*, 2022 WL 497352, at *3; *Papczynski*, 2017 WL 4900356, at *4. CCN employees working in Gwinn, such as Schultz, received paychecks from CCN. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) But "'who writes the check is not dispositive of the employer-employee relationship,' especially considering [Devere] paid [CCN] for each hour [Schultz] worked on the job." *Etheridge*, 2022 WL 497352, at *3 (citing *Kidder v. Miller-Davis Co.*, 455 Mich. 25, 44 (1997)). Thus, a reasonable jury may determine that "the economic reality of the situation," *id.*, is that Devere contributed to the payment of Schultz's wages and that Schultz might not have been paid if Devere did not pay CCN. *See Bolen*,

2021 WL 641709, at *7. A jury could therefore conclude that the second factor of the economic reality test regarding the payment of wages favors a finding of an employer-employee relationship between Devere and Schultz.

### iii. *Third* Adanalic *Factor: Right to Hire, Fire, and Discipline*

With respect to the third *Adanalic* factor—the right to hire, fire, and discipline—Defendant states in its motion that "CCN has the sole right to hire, fire and discipline" but provides no explanation for this statement. (ECF No. 23, PageID.86; *see* ECF No. 30, PageID.891–892.) In its response, Plaintiff argues that "[t]here is no dispute that Darwin Stienke, through Devere Industrial and Chris Crittenden, has the right to hire, fire and discipline millwrights on the National Carbon Plant job." (ECF No. 29, PageID.691.) Plaintiff references portions of Stienke's testimony indicating that there was no distinction between union and non-union millwrights, that Stienke disciplined the millwrights in Gwinn, and that employees in Gwinn had to request time off from Stienke. (*See id.*) Plaintiff states that Stienke "had this authority through his 'employment' with Devere, wherein he had been on this job for 2+ years." (*Id.*)

79

In this case, there is evidence that CCN had the right to hire, fire, and discipline Schultz. Johnson indicated that he called Schultz to offer him work. (*See* ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.806–807.) Johnson was Schultz's boss and was responsible for disciplining him. (*See* ECF No. 23-3, PageID.102–103; ECF No. 29-2, PageID.790–791.) Johnson testified that he reprimanded and/or fired CCN employees that were supervised by Stienke. (*See* ECF No. 23-3, PageID.108; ECF No. 29-2, PageID.812–813.) Crittenden testified that CCN employees working in Gwinn were disciplined by CCN. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.716.) In addition, Stienke—a CCN employee—testified that he offered Schultz the job in Gwinn and could discipline him and fire him from the job. (*See* ECF No. 23-5, PageID.169, 174–176; ECF No. 29-3, PageID.847, 867–868, 872–873.)

The Michigan Court of Appeals indicates that "[t]he main point [of the third *Adanalic* factor] is that if the worker can be 'fired' without having any legal recourse, i.e., a breach-of-contract claim, then it is likely the worker is an employee, not an independent contractor who would have such rights." *Duckworth*, 333 Mich. App. at 215 (citing

*McKissic*, 42 Mich. App. at 208). Here, Stienke indicated that Schultz worked for CCN in December 2019 but did not have a contract with CCN. (*See* ECF No. 23-5, PageID.170; ECF No. 29-3, PageID.850.) Schultz was an at-will employee who was not committed to working for CCN. (*See id.*) According to Stienke, Schultz "could work wherever [ ]he[ ] want[ed]." (*Id.*) Stienke indicated that when Schultz got into the union, "he could have worked for multiple employe[r]s." (ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.844.) Johnson and Stienke testified that CCN employees such as Schultz can leave at any point and are paid only for the hours they work. (*See* ECF No. 23-3, PageID.106; ECF No. 23-5, PageID.178; ECF No. 29-2, PageID.805–806; ECF No. 29-3, PageID.882.) Thus, there is no evidence that Schultz could assert a breach of contract claim against CCN if CCN had fired him, which favors a finding of an employment relationship between CCN and Schultz.

However, there is evidence that Devere had the right to hire, fire, and discipline Schultz if Stienke is considered part of Devere. As noted, Stienke regularly reported to, and took direction from, Crittenden, and Johnson indicated that Stienke was essentially working for Crittenden

in Gwinn. Stienke supervised Devere and CCN employees in Gwinn, and he agreed during his deposition that he acted as Crittenden's "eyes and ears" at the National Carbon plant. (ECF No. 23-5, PageID.173; ECF No. 29-3, PageID.860–861.) Stienke decided to have Schultz work at the Gwinn plant, and no one told Stienke to call Schultz about the job. (*See* ECF No. 23-5, PageID.174–175; ECF No. 29-3, PageID.867–868.) Stienke indicated that he disciplined or corrected Schultz if Schultz did not show up to work or perform his job satisfactorily (*see* ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.847) and that Schultz had to ask Stienke for time off. (*See* ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.847; *see also* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.716–717.)

Stienke could fire employees from the Gwinn job, and then Crittenden or Johnson would make the "ultimate decision" of whether to fire the employee from the company. (ECF No. 23-5, PageID.176; ECF No. 29-3, PageID.872–873.) The Michigan "Supreme Court has equated the ability to remove an unsatisfactory worker with the right to hire, fire, and discipline." *Toduti*, 2021 WL 4001802, at *5 (citing *Kidder*, 455 Mich. at 45); *see Bolen*, 2021 WL 641709, at *8 (stating that

82

"the ability to remove a worker from the job site is tantamount to the ability to hire, fire, and discipline that worker" (citing *Chiles v. Machine Shop*, 238 Mich. App. 462, 467–68 (1999))).

Regarding the issue of whether Schultz "can be 'fired' without having any legal recourse, i.e., a breach-of-contract claim," against Devere, *Duckworth*, 333 Mich. App. at 215 (citing *McKissic*, 42 Mich. App. at 208), there is no indication in the record that Devere would have suffered any legal consequence if it had fired Schultz or removed him from the National Carbon plant job. No contracts or agreements were signed between Devere and the CCN employees stationed in Gwinn, such as Schultz, that would have given Schultz a basis for asserting a breach of contract claim against Devere if he had been terminated. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) Therefore, a reasonable jury could conclude that Stienke was Crittenden's representative in Gwinn and that Devere had the right to hire, fire, and discipline Schultz, which supports a finding of an employment relationship between Devere and Schultz.

    *iv. Fourth* Adanalic *Factor: The Performance of the Duties*
     *as an Integral Part of the Employer's Business Towards*
     *the Accomplishment of a Common Goal*

  The fourth *Adanalic* factor considers whether the performance of

the worker's duties are an integral part of the employer's business

towards the accomplishment of a common goal. With respect to this

factor, Defendant simply states in its motion—without any

elaboration—that "the performance of the duties are an integral part of

the [sic] CCN's business towards the accomplishment of a common

goal." (ECF No. 23, PageID.86.) In its response, Plaintiff argues that

"[t]here is no factual dispute that Mr. Schultz was working with and/or

for Devere towards the accomplishment of Devere's goal in completing

the work at National Carbon Plant." (ECF No. 29, PageID.691.)

  "Under the fourth factor [of the economic reality test], the

question is not whether the particular worker is integral to the business

but instead whether the *type of work* is integral to the business."

*Toduti*, 2021 WL 4001802, at *5 (emphasis in original) (quoting

*Duckworth*, 333 Mich. App. at 216). Here, Johnson testified that CCN is

a "general contracting and labor" business and that it is "a union

company." (ECF No. 23-3, PageID.101; ECF No. 29-2, PageID.786.)

CCN supplies labor to other companies (mostly Devere) and has its own construction projects. (*See* ECF No. 23-3, PageID.101, 105–106; ECF No. 29-2, PageID.787, 803–805.) Schultz's "duties as a [union millwright] for [CCN] appear to be an integral part of the accomplishment of common goals, namely: providing [labor] services for income." *Toduti*, 2021 WL 4001802, at *5. Therefore, it is possible to conclude that Schultz's job was integral to CCN's business, which favors a finding that Schultz was an employee of CCN.

But it is possible to conclude that Schultz's work was integral to Devere's business as well. Crittenden testified that Devere "provide[s] . . . skilled millwright labor to local plants, cement plants, limestone plants, wood plants for their equipment overhauls." (ECF No. 23-4, PageID.128; ECF No. 29-1, PageID.707.) In Gwinn, Devere worked with CCN and CCN's union millwrights, including Schultz, "toward the goal of completing the project for" the National Carbon plant. *Bolen*, 2021 WL 641709, at *8. Schultz's work as a skilled millwright therefore appears to be integral to Devere's business, which favors a finding that Schultz was an employee of Devere. *See id.* (concluding that "[t]he trial court properly determined the fourth factor of the economic reality test .

. . favored a finding [the individual] plaintiff was an employee of defendant" because "[t]he trial court found plaintiff was hired to help inspect parts for defendant, and together, plaintiff and defendant worked toward the 'common objective of completing the project for General Motors'"[16]).

---

[16] In its own analysis in *Bolen* of the fourth factor of the economic reality test, the Michigan Court of Appeals determined that "the trial court did not err in concluding the fourth factor favored a finding plaintiff was an employee of defendant" because the

> defendant could not have completed its job for General Motors without the help of ATCO and its employees to perform the inspections necessary to pass General Motors's GP-12 process, and ATCO's employees, including plaintiff, worked toward the goal of completing the project for General Motors. See *Kidder*, 455 Mich. at 45 ("[The customer] could not have completed its renovations without employing [the labor broker's] workers and the [labor broker's] workers were working toward completing Miller-Davis' project goals.").

2021 WL 641709, at *8 (alterations in original).

Here, it is unclear from the record whether Devere could have completed the National Carbon plant job without CCN and CCN's employees. Crittenden testified that he needed CCN employees "[f]or their technical millwright expertise," given that CCN's union millwrights were "more skilled" than Devere's non-union millwrights. (ECF No. 23-4, PageID.138; ECF No. 29-1, PageID.750.) Crittenden relied on Stienke, who had "the most knowledge of [the National Carbon] plant" (ECF No. 23-3, PageID.107; ECF No. 29-2, PageID.810–811), to supervise the job in Gwinn. Moreover, Plaintiff's counsel stated during the hearing that, regarding Devere and union millwrights, "there's no doubt they need them." At the same time, Stienke indicated that Devere and CCN employees sometimes perform the same job, that a Devere employee performed the work Schultz was doing before the accident, and that Stienke was not required to use union millwrights for the job in Gwinn. (*See* ECF No. 23-5, PageID.174; ECF No. 29-3, PageID.866.) However, viewing the

> v. *Third* McKissic *Factor: Is the position or job of such a nature that the employee primarily depends upon the emolument for payment of his living expenses?*

The parties do not discuss the third *McKissic* factor in their filings. This factor asks whether the position or job is of such a nature that the employee primarily depends upon the compensation to pay his or her living expenses. During the hearing, Defendant's counsel addressed this factor by stating that Schultz received his regular income through his CCN paycheck and that he was a "W2 employee" of CCN. Plaintiff's counsel argued that there is no dispute that Devere paid for Schultz's living expenses during the months that he was in Gwinn because Devere paid for apartments where the millwrights could stay free of charge during the week and through the weekend. But Plaintiff's counsel also stated that he "do[es]n't know enough about [this factor]."

An individual relying on a job for "payment of his living expenses" "weighs in favor of the conclusion that [the individual] should be considered an employee." *Duckworth*, 333 Mich. App. at 216; *see Hyslop*

---

evidence in a light most favorable to Plaintiff, a jury could conclude that Devere needed CCN and CNN's employees, including Schultz and Stienke, to complete the project at the National Carbon plant in Gwinn.

*v. Klein*, 85 Mich. App. 149, 158 (1978) ("There is no dispute that the plaintiff's sole sources of maintenance during the relationship was the emolument received from the defendant. Such dependence further evidences plaintiff's employee status." (internal citation omitted)). In *Morin v. Dep't of Soc. Servs.*, a workers' compensation case, the Michigan Court of Appeals considered "the eight-step 'economic reality' test outlined in *McKissic*." *Morin v. Dep't of Soc. Servs.*, 174 Mich. App. 718, 722 (1989) (quoting *McKissic*, 42 Mich. App. at 208–09). In its analysis of the third *McKissic* factor, the court stated that "[o]ne of the purposes of the [*McKissic*] test is to determine which workers 'are utterly dependent, as a matter of economic reality, upon another, their employer.'" *Id.* at 723–24 (quoting *McKissic*, 42 Mich. App. at 206). In *Duckworth*, the No-Fault Act case discussed above, the Michigan Court of Appeals found that the third *McKissic* factor "indicate[d] an employee-employer relationship" because "Speed Express[, which had contracted with plaintiff to haul and deliver goods on its behalf,] was plaintiff's sole source of income; i.e., he relied on the job for 'payment of his living expenses[.]'" *Duckworth*, 333 Mich. App. at 207, 216 (last

alteration in original) (footnote omitted) (quoting *McKissic*, 42 Mich. App. at 208).

In this case, Schultz was assigned to work on Devere's project in Gwinn, where he typically worked a forty-hour workweek from Monday through Thursday. (*See* ECF No. 23-3, PageID.102; ECF No. 23-4, PageID.129, 133; ECF No. 23-5, PageID.169–170; ECF No. 29-1, PageID.711, 730; ECF No. 29-2, PageID.789; ECF No. 29-3, PageID.846, 851.) Schultz was paid by the hour for his work at Devere's job (*see* ECF No. 23-5, PageID.169–170, 174; ECF No. 29-3, PageID.847–848, 866–867), and there is no indication in the record that Schultz had an additional source of income. Schultz's paychecks came from CCN. (*See* ECF No. 23-4, PageID.130; ECF No. 29-1, PageID.717.) But it is possible to find that his wages were paid by Devere through CCN and Devere's labor broker relationship, as noted above. Therefore, a jury could conclude that the economic reality was that Schultz depended on Devere to pay his living expenses because the Devere job was Schultz's sole source of income.

###### vi. *Fourth* McKissic *Factor: Does the employee furnish his own equipment and materials?*

As to the fourth *McKissic* factor—whether the employee furnishes his or her own equipment and materials—Defendant states in its motion that Schultz "and/or CCN provide any non-powered tools and equipment." (ECF No. 23, PageID.86.) Plaintiff states in its response that

> [a]s it pertains to the furnishing of equipment and tools, the facts are not disputed that Jeremie Schultz would provide his own hand tools while all other power tools, heavy equipment and supplies necessary to perform his job would be provided by Devere Industrial. Exhibit A - DTCC [Deposition Transcript of Christopher M. Crittenden]; pp. 18, lines 14-24.
>
> Darwin Stienke confirmed that millwrights would bring their hand tools and wrenches, while everything else would be provided by Devere.

(ECF No. 29, PageID.692.)

An individual not furnishing his or her own equipment or materials "indicate[s] an employee-employer relationship." *Duckworth*, 333 Mich. App. at 216. In this case, Crittenden, Johnson, and Stienke testified that at the job in Gwinn, workers such as Schultz provided their own millwright tools, which included wrenches, sockets and

90

hammers. (*See* ECF No. 23-3, PageID.104; ECF No. 23-4, PageID.130; ECF No. 23-5, PageID.170, 177; ECF No. 29-1, PageID.715–716; ECF No. 29-2, PageID.798; ECF No. 29-3, PageID.848–849, 877–878.) Workers had the option to provide their own PPE or safety items. (*See* ECF No. 23-4, PageID.133; ECF No. 23-5, PageID.170, 177; ECF No. 29-1, PageID.727; ECF No. 29-3, PageID.848–849, 877–878.)

Devere provided workers in Gwinn with "power equipment" that included power tools, welders, chainfalls, grinders, and impact wrenches. (*See* ECF No. 23-4, PageID.130, 133; ECF No. 29-1, PageID.715, 727.) Devere also provided PPE or safety items (*see id.*) "such as safety glasses or dust masks or safety vests." (ECF No. 23-4, PageID.133; ECF No. 29-1, PageID.727.) The equipment and supplies needed for the Gwinn project were purchased or owned by Devere. (*See* ECF No. 23-4, PageID.137; ECF No. 23-5, PageID.170, 177; ECF No. 29-1, PageID.746; ECF No. 29-3, PageID.848–849, 877.) Therefore, a reasonable jury could conclude that Devere furnished equipment and materials to Schultz, which supports a finding of an employment relationship between Devere and Schultz.

> ### vii. Fifth McKissic Factor: Does the individual seeking employment hold himself out to the public as one ready and able to perform tasks of a given nature?

Regarding the fifth *McKissic* factor—whether the individual seeking employment holds himself or herself out to the public as one ready and able to perform tasks of a given nature—Defendant states in its motion that Schultz "is a union millwright that typically performs his duties for the highest bidding company."[17] (ECF No. 23, PageID.86.) Plaintiff does not address this factor in its response. When asked about this factor during the hearing, Defendant's counsel discussed the difficulty of applying "these tests . . . in this case" and stated that the deposition testimony is clear that Schultz is a "W2 employee" of CCN, which "manages and secures work for . . . [millwrights] that are union guys." Defendant's counsel stated that Schultz "has never been and has never expected to be" an employee of Devere and "wants to remain a union guy." When Plaintiff's counsel was asked about this factor, he stated that although union millwrights "had the ability to jump jobs," they "showed up for work" and "weren't hopping jobs weekly. There was

---

[17] Defendant does not indicate in its motion which economic reality test factor this statement relates to. The Court presumes that it relates to the fifth *McKissic* factor.

no postings or anything that had them doing anything other than the project they were on."

An individual not holding himself or herself out to the public as one ready and able to perform tasks of a given nature "weighs in favor of the conclusion that [the individual] should be considered an employee." *Duckworth*, 333 Mich. App. at 216. In this case, Johnson indicated that he called Schultz to offer him work and that Schultz worked for other union companies. (*See* ECF No. 23-3, PageID.106; ECF No. 29-2, PageID.806–807.) Stienke testified that he called Schultz to offer him the job at the Gwinn plant. (*See* ECF No. 23-5, PageID.174–175; ECF No. 29-3, PageID.867–868.) Stienke indicated that when Schultz got into the union, "he could have worked for multiple employe[r]s." (ECF No. 23-5, PageID.169; ECF No. 29-3, PageID.844.) Stienke did not know when Schultz was hired by CCN or if he worked outside of CCN in the few years before the accident. (*See* ECF No. 23-5, PageID.178; ECF No. 29-3, PageID.883.) Because it is unclear from the evidence whether Schultz holds himself out to the public as someone who is "ready and able" to perform the tasks of a union millwright (or the tasks of a different "given nature"), *Duckworth*, 333 Mich. App. at

212 (quoting *McKissic*, 42 Mich. App. at 208), Defendant does not show that this factor favors granting summary judgment to it.

> viii. *Sixth* McKissic *Factor: Is the work or the undertaking in question customarily performed by an individual as an independent contractor?*

In their filings, the parties do not address the sixth *McKissic* factor: whether the work or undertaking in question is customarily performed by an individual as an independent contractor. During the hearing, the following exchange between the Court and Plaintiff's counsel took place regarding this factor:

> THE COURT: . . . [T]he last [factor] is whether the project is generally performed by an independent contractor. And here it's generally performed by a union—they wanted a union mill[w]right and that's what CCN provides.

> PLAINTIFF'S COUNSEL: And they had as counsel pointed out and I agree with him, I don't know if it was 50/50 on this job. But there were union and non union [millwrights], one in the same working on the project.

Because the parties do not indicate whether the work or undertaking involved in this case is generally performed by an independent contractor, the Court lacks sufficient information to conclude whether this factor favors granting summary judgment to Defendant.

94

> ix. *Eighth* McKissic *Factor: Weight should be given to those*
> *factors which will most favorably effectuate the objectives*
> *of the statute.*

The eighth *McKissic* factor instructs that weight should be given

to the economic reality test's factors that will most favorably effectuate

the objectives of the statute. Regarding the objectives of Mich. Comp.

Laws § 500.3114(3), the Michigan Court of Appeals states:

> We have recognized that the purpose of the employer-
> employee exception, MCL 500.3114(3), to the general priority
> statute of MCL 500.3114(1) is to provide predictability in
> commercial settings by imposing liability on an employer's
> insurer rather than the insurer of the injured individual.
> *Besic v. Citizens Ins. Co. of the Midwest*, 290 Mich. App. 19,
> 31–32; 800 N.W.2d 93 (2010). Additionally, the Michigan
> Supreme Court has recognized that the cases interpreting
> MCL 500.3114(3) "have given it a broad reading designed to
> allocate the cost of injuries resulting from use of business
> vehicles to the business involved through the premiums it
> pays for insurance." *Celina Mut. Ins. Co.*, 452 Mich. at 89.
> However, . . . one must qualify as an "employee" in order for
> the employer's insurer to be liable for the employee's PIP
> benefits under MCL 500.3114(3); the insurer of a business
> vehicle is not automatically held liable without such a
> showing. *Adanalic*, 309 Mich. App. at 190.

*Farm Bureau Gen. Ins. Co. of Am.*, 2017 WL 2348747, at *4. The

Michigan Court of Appeals has also stated that "it appears to us that

the Legislature intended, by enacting MCL 500.3114(3), to shift the

95

burden of providing PIP benefits to the insurers of vehicles in certain commercial contexts, probably because those insurers will be in a better position to evaluate the risks against which they are insuring." *Miclea*, 333 Mich. App. at 671–72 (citing *Celina Mut. Ins. Co. v. Lake States Ins. Co.*, 452 Mich. 84, 89 (1996)); *see Dairyland Ins. Co.*, 2013 WL 1748572, at *2 ("[W]e have noted that, in commercial situations, it was the Legislature's intent to place the burden of providing no-fault benefits on the insurers of those motor vehicles, such as those vehicles owned by or registered to an employer." (citing *State Farm Mut. Auto. Ins. Co. v. Sentry Ins.*, 91 Mich. App. 109, 114 (1979))). The court has articulated the following public policy concerns regarding Mich. Comp. Laws § 500.3114(3):

> [R]equiring both insurers to contribute to the payment of benefits would run contrary to the overall goal of the no-fault insurance system, which is designed to provide victims with assured, adequate, and prompt reparations at the lowest cost to both the individuals and the no-fault system. Splitting the obligation to pay would result in duplicative administrative costs, by requiring several insurers to adjust a single claim. [*Celina*, 452 Mich. at 89 (citations and footnote omitted).]

*Alghali v. Hanover Ins. Co.*, No. 343359, 2020 WL 3886194, at *5 (Mich. Ct. App. July 9, 2020).

96

In *Duckworth*, the Michigan Court of Appeals determined that

> under the eighth *McKissic* factor, the objectives of MCL
> 500.3114(3) would be effectuated by ruling that plaintiff was
> an employee, thus making Cherokee[, the defendant and no-
> fault insurer of the business vehicle involved in the
> accident,] first in priority. As this Court reasoned in *State
> Farm Mut. Auto. Ins. Co. v. Sentry Ins.*, 91 Mich. App. 109,
> 114, 283 N.W.2d 661 (1979), "A company issuing insurance
> covering a motor vehicle to be used in a [MCL 500.3114(2) or
> (3)] situation will know in advance the scope of the risk it is
> insuring." Cherokee accepted the risks associated with Speed
> Express's trucking business, and so holding it liable furthers
> the Legislature's decision to make the insurer of the
> business vehicle higher in priority than the worker's
> personal insurer when the business vehicle is involved in the
> accident. See also *Celina*, 452 Mich. at 89, 549 N.W.2d 834
> ("The cases interpreting [MCL 500.3114(3)] have given it a
> broad reading designed to allocate the cost of injuries
> resulting from use of business vehicles to the business
> involved through the premiums it pays for insurance.").

*Duckworth*, 333 Mich. App. at 216–17 (second and third alterations in

original) (footnote omitted).

In this case, the objectives of Mich. Comp. Laws § 500.3114(3)

would be effectuated by finding that Schultz was an employee of

Devere. Requiring Defendant to cover Schultz's PIP benefits would

"further[ ] the Legislature's decision to make the insurer of the business

vehicle higher in priority than the worker's personal insurer." *Id.* at 217 (internal citation omitted).

In sum, the Court denies Defendant's summary judgment motion because viewing the evidence in a light most favorable to Plaintiff, it is possible to conclude that Devere was Schultz's employer under the economic reality test for purposes of applying Mich. Comp. Laws § 500.3114(3). A reasonable jury could determine that the following economic reality test factors favor a finding that Schultz was an employee of Devere: control of the worker's duties; payment of wages; right to hire, fire, and discipline; the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal; whether the position or job is of such a nature that the employee primarily depends upon the emolument for payment of his living expenses; whether the employee furnishes his own equipment and materials; and giving weight to the factors that will most favorably effectuate the objectives of the statute. *See Duckworth*, 333 Mich. App. at 211–14.

**D.   Scope of Employment**

Defendant argues in its summary judgment motion that "even if it was determined that Mr. Schultz were an employee of Devere, he was not acting within the scope of his employment at the time of the accident. As such, neither Devere nor its insurer, [Defendant] Cincinnati, is liable for any potential PIP benefits." (ECF No. 23, PageID.87–88; *see* ECF No. 30, PageID.892.) Plaintiff argues in its response that "in accordance with MCL 500.3114(3), there is no requirement that Mr. Schultz be within the scope of his employment at the time of the accident." (ECF No. 29, PageID.686.) Plaintiff states that "if an employee is an occupant of a motor vehicle owned or registered to that employer, they **shall** receive personal protection insurance benefits from the insurer of the furnished vehicle." (*Id.* (emphasis in original).)

> The Michigan Court of Appeals notes that
>
> there is published caselaw expressly holding that that [sic] an employee does not need to be using the employer-furnished vehicle in the course of business for purposes of MCL 500.2114(3). In *State Farm Mut. Auto. Ins. Co. v. Hawkeye-Security Ins. Co.*, 115 Mich. App. 675, 679-681; 321 N.W.2d 769 (1982), this Court specifically rejected the defendant's argument that MCL 500.3114(3) does not apply

in situations where an injured employee used an employer-furnished vehicle for personal use that was outside the scope of the employee's employment:

> Defendant's interpretation would require an injured employee to establish, as a prerequisite to obtaining no-fault benefits, that his injuries occurred in the course of his employment. Such a potentially costly and dilatory procedure would be contrary to a principal purpose of the no-fault act, which is to facilitate the swift resolution of claims. Additionally, had the Legislature desired to limit the operation of § 3114(3) to injuries occurring in the course of employment, it would have been a simple matter to insert a sentence or phrase so providing.
>
> * * *
>
> Accordingly, we conclude that § 3114(3) of the no-fault act was meant to apply in any situation in which an employee is injured while occupying a vehicle owned by his employer, regardless of whether the injury occurred in the course of his employment. [(Citations omitted).]

Similarly, in *Auto Club Ins. Ass'n v. Maryland Cas. Co.*, 177 Mich. App. 40, 43; 441 N.W.2d 16 (1989), this Court again held:

> [MCL 500.3114(3)] contains no requirement that the injured person have possession or control of the vehicle. On the contrary, the statute expressly provides for recovery from the

100

employer's insurer by mere "occupant[s]" of the
vehicle. Further, the fact that the accident
occurred on a social rather than on a business
outing is beside the point in the determination of
the applicability of the employer-owned vehicle
exception. [(Second alteration in original).]

Thus, it is not dispositive that Beatrice[, one of the plaintiffs
who was a passenger in the vehicle involved in the motor
vehicle accident,] was using the vehicle for personal reasons,
not in the course of her business.

*Alghali*, 2020 WL 3886194, at *3–4 (last alteration added).

Based on the caselaw discussed above, Defendant's argument that
it is not liable for PIP benefits because Schultz was not working within
the scope of his employment when the accident took place fails.
Accordingly, Defendant is not entitled to summary judgment.

## IV.   Conclusion

For the reasons set forth above, the Court DENIES Defendant's
motion for summary judgment (ECF No. 23).

IT IS SO ORDERED.

Dated: September 7, 2022                s/Judith E. Levy
      Ann Arbor, Michigan            JUDITH E. LEVY
                                United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 7, 2022.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager